STATE *ex rel.* William J. Hahn, Attorney General, *vs.* MINNESOTA
CENTRAL RAILWAY COMPANY.

SAME *vs.* HASTINGS & DAKOTA RAILWAY COMPANY.

December 22, 1886.

**Corporation—Forfeiture of Charter for Non-User or Misuser.**—It is
a tacit condition, annexed to or implied in the charter of every private cor-
poration, that the government may resume its corporate franchises for a
misuser or non-user thereof.

**Same—Railway Company—Suspension of Business for a Year—Dis-
solution.**—The statute (Gen. St. 1878, *c.* 76, § 11) provides that the sus-
pension of its lawful business by a railroad company for one year shall
be a ground of forfeiture "of its privileges and franchises acquired under
the laws of this state." But the corporation is not to be deemed dis-
solved until such forfeiture is judicially ascertained and declared.

**Same—Quo Warranto by Attorney General—Duty of Court.**—Where,
in a proceeding by the attorney general in behalf of the state for the dis-
solution of a corporation under the statute, the facts clearly bring the
case within its terms, it is mandatory upon the court to declare a for-
feiture.

**Same—Duties of Railway Company—What is Suspension of Busi-
ness—Exercise of Subordinate Franchises.**—The duty of a railroad
corporation to maintain and operate its road is a public duty, and the
chief end and object of its creation and existence, and the condition and
consideration upon which it receives its grants and franchises from the
state; and the suspension of such duties is a suspension of its lawful
business within the meaning of the statute, and a cause for declaring a
forfeiture, though the corporation also possess, and continue to exercise,
other franchises, subordinate and secondary to its principal franchises
and business, unless such forfeiture is waived, or the right to continue
to exist as a corporation after such suspension of its business is sanc-
tioned by the state.

**Same—Exemption from Taxation—Sale of Railway—Waiver of For-
feiture by State Officers or by Delay.**—The right to hold exempt
from taxation lands granted to a railroad corporation in aid of its princi-
pal enterprise is a franchise, but ancillary and subordinate; and the right
to exercise such franchise, and *to continue its corporate existence for*

such purposes only, cannot lawfully survive after a sale of its railroad, and the abandonment of its principal business as a railroad corporation, unless by the authority of the legislature expressed or clearly implied. The rights of the state are not lost by delay merely, nor can they be waived by its executive officers.

**Same—Sale of Railway, reserving Land Grant, held Ground for Dissolution.**—The respondents (railway corporations) were each endowed with land grants in connection with their other chartered privileges, and, after completing the respective railroads authorized by their charters, disposed of and transferred the same to another railway corporation, reserving, however, the granted lands and certain corporate rights to themselves; and since that time, to wit, for several years, such other corporation has claimed to own, and has in fact controlled and operated, the railroads so transferred; and these respondents thereupon altogether ceased to control or operate such roads, and disclaim any interest therein, and have never since transacted any business as railroad corporations, exercising only such franchises as pertained to the land grants held by them. The terms of such transfer, separation, and reservation of franchises were, however, never sanctioned by the legislature. *Held*, in *quo warranto* proceedings in behalf of the state, that, upon the facts disclosed and admitted upon the record, a case is made warranting a judgment of forfeiture, and for a dissolution of both corporations.

These were two proceedings in *quo warranto*, instituted in this court by the attorney general. Before answering, the respondent in each case moved to quash the writ for want of jurisdiction, on the ground that the writ showed that the state had a plain, adequate, and complete remedy by civil action in the district court. The motions were denied. The respondents thereupon answered, and the cases were heard together upon demurrers to the answers. The facts appearing in the pleadings are substantially as follows:

1.

In the Minnesota Central Case: This respondent acquired on March 6, 1863, by grant from the state, (Sp. Laws 1863, *c.* 2,) all the rights, franchises, and property of the Minneapolis & Cedar Valley Railroad Company, which was incorporated by act of the territorial legislature March 1, 1856, (Laws 1856, *c.* 166,) by which act it was authorized to construct and operate a railway from Minneapo-

lis, via Faribault, to the south line of the state, west of range 16; and by the act of May 22, 1857, (Laws 1857, Ex. Sess. *c*. 1, *subc*. 3, § 6,) the company was endowed with the lands granted by the act of congress of March 3, 1857, to aid in the construction of the line of railroad which, by its charter, it was authorized to build. This corporation was one of the land-grant companies which received aid from the state pursuant to the loan amendment to the constitution, and its property and franchises, upon foreclosure of the securities taken by the state, became vested in the state, and were held without merger or extinguishment until regranted to the respondent as before stated.

By the act of May 22, 1857, making the land grant, it was provided that "said lands so granted shall be and are exempt from taxation until the same shall have been sold and conveyed by said companies." By the same act the same exemption from taxation was made in regard to the company's railroad, and the property used in connection with it, and the company was required to pay to the state, in lieu of other taxes, a percentage of its gross earnings, and to make annual reports of such earnings. By the act of March 1, 1856, the original company was also authorized to unite its railroad with any other railroad then or thereafter constructed in the territory or any adjoining state or territory, upon such terms as should be satisfactory to the connecting companies, and for that purpose was given full power to make and execute such contracts with any other company as would secure the object of such connection. By the act of March 6, 1863, granting to the respondent the franchises of the former company, the time limited for the completion of its railroad was extended to January 1, 1866, and the exemption of its property and land grant was reaffirmed, with the modification that the lands should become taxable when contracted to be sold.

By acts approved February 1, 1864, (Sp. Laws 1864, *c*. 2,) and March 4, 1865, (Sp. Laws 1865, *c*. 5,) the act of March 6, 1863, was amended, and the time for completing respondent's line extended. By the former act respondent was given its present name, and was vested with whatever lands congress should afterwards grant to the state in aid of its line. And in the latter act it was further provided

that whenever respondent should contract to sell or lease any of its granted lands, such lands should be placed on the tax list for taxation like other lands, but in enforcing collection of the taxes the title or interest of the respondent, or its trustees or mortgagees, should be in nowise affected; but the improvements on the land and the purchaser's or lessee's interest should be sold on default in payment of the taxes. By the act of February 28, 1866, (Sp. Laws 1866, *c.* 4,) the time for the completion of the road was further extended.

In 1866, and within the time limited by the acts above cited, the respondent had completed or nearly so that part of its line between Minneapolis and Austin, in the county of Mower. In that year the railway of the McGregor Western Railway Company (an Iowa corporation) was in course of construction from McGregor, in Iowa, to the Minnesota state line, and it was desired that such railway should be connected with that of respondent at Austin; and, to enable such connection to be made, the legislature, by act of February 24, 1866, (Sp. Laws 1866, *c.* 8,) empowered "any company owning or controlling, by lease or other contract, the McGregor Western Railway," to make such connection at Austin, and conferred on "said railway company" all the powers, rights and privileges of railway corporations of this state, upon its filing a copy of its charter or articles of association with the secretary of state, which was accordingly done. By act of March 7, 1867, (Sp. Laws 1867, *c.* 8,) it was provided that the McGregor Western Company, "having acquired by purchase or otherwise the capital stock of the Minnesota Central Railway Company, may exercise, within this state, all the rights, privileges, and franchises which have heretofore been or which shall hereafter be conferred upon the Minnesota Central Railway Company, and shall be subject to all the duties and liabilities incurred by or imposed upon said company."

Afterwards, and in the year 1867, pursuant to these acts and to the power granted in the original charter to make and execute such contracts with any other company as would secure the object of a connection, the respondent conveyed to the McGregor Western Company its line of railway from Minneapolis to Austin, with its rolling stock, equipment, and appurtenances, and with the franchises appertaining

to that portion of its road, but did not convey its franchise to be a corporation nor any part of its land grant.    Soon afterwards, and in the same year, the Milwaukee & St. Paul Railway Company (now the Chicago, Milwaukee & St. Paul Railway Company) became the owner of the McGregor Western Railway Company's line, including the road from Minneapolis to Austin, and on August 7, 1867, all of the companies joined in a deed of trust of the property formerly owned by the McGregor Western Company, which recited the above-mentioned sale by respondent and the then ownership of the line by the Milwaukee & St. Paul Railway Company; which deed was at once filed and recorded in the office of the secretary of state.    The Milwaukee & St. Paul Company entered into the possession and management of the line from Minneapolis to Austin, which it has ever since operated. At the beginning of the next session of the legislature, that company issued annual passes over the road from Minneapolis to Austin, naming itself as the owner thereof, and delivered them to every member and officer of the legislature.    By the act of March 5, 1868, (Sp. Laws 1868, c. 4,) amending the act of 1864, the legislature recognized the continued existence of respondent as a corporation, and conferred upon it additional franchises in respect to condemnation of land.    The same legislature, by an act approved February 29, 1868, (Sp. Laws 1868, c. 5,) entitled "An act authorizing the conveyance of lands to the Minnesota Central Railway Company, and extending the time for the completion of that portion of the original line of said company from Austin to the Iowa state line west of range 16," authorized conveyances to respondent by the governor of such of the granted lands as pertained to the completed portion of the road, and the execution to the respondent of a deed in fee-simple of the residue of the granted lands, whenever such conveyance should be authorized by congress.    By the same act the time for the completion of the road from Austin to the state line was extended for two years, and provision made for its connection with "a connecting road in the state of Iowa."

By act of congress of March 3, 1865, the land grant for respondent's line was increased from six to ten sections per mile, all which lands were by the governor, pursuant to the above-mentioned legisla-

tion, afterwards conveyed to the respondent, a portion of which are still held undisposed of by respondent, which claims to hold them as a corporation exempt from taxation, and to have a right to dispose of them as a corporation, pursuant to the franchise before mentioned.

Relying on these acts in continued recognition of its corporate existence by the legislature, as well as on the power to dispose of its road to a connecting line conferred upon it in the various acts above mentioned, the respondent proceeded to complete the remainder of its road from Austin to the state line, and on the 15th of February, 1870, having completed its entire line from Minneapolis to the state line, · and the Milwaukee & St. Paul Railway Company having acquired control of the Iowa road connecting with that of respondent at the state line, the respondent, under the power in the original charter to make and execute such contracts with any other company as would insure such connection, conveyed that part of its road from Austin to the state line to the Milwaukee & St. Paul Company, in the belief that it had the approval of the state in so doing. In December, 1870, the state treasurer reported to the legislature the receipt from the Milwaukee & St. Paul Company of 2 per cent. of its gross earnings, at which time the road so conveyed by the respondent was the only one operated by the Milwaukee & St. Paul Company in this state. In that report no taxes are reported as received from this respondent.

After this completion and transfer of its railway, the governor conveyed to respondent the residue of the congressional land grant as authorized by the act of 1868, and the state auditor and land commissioner, in his next annual report to the legislature, reported the amount of land so conveyed. Both these reports of the treasurer and auditor were received by the legislature as satisfactory and without objection, and the money so paid into the state treasury was appropriated for public uses by the legislature, with full knowledge of both of the transfers. By an act approved February 28, 1872, (Sp. Laws 1872, c. 93,) confirming the purchase by the Milwaukee & St. Paul Company of the St. Paul & Chicago Railway, extending from St. Paul to La Crescent, and authorizing the purchaser to own and operate it, the railway built by respondent from Minneapolis to the Iowa line is referred to as "the present line of railway of the Milwaukee

& St. Paul Railway Company, heretofore belonging to the Minnesota Central Railway Company."

From 1870 for a period of 16 years the respondent "has been in the constant, open, and public user of that part of its original franchises to be a corporation and which conferred the right and power to acquire the title of the lands so granted by congress as aforesaid, and to hold the same exempt from taxation, and to sell and dispose of them, and has disposed of a large portion of said lands, but has still upwards of 30,000 acres remaining undisposed of although it has used its best efforts to do so; and during all these years the Milwaukee & St. Paul Railway Company has made the payment of the percentage on its gross earnings required by the charter of respondent to be paid into the state treasury each year, which payments have been reported to the legislature by the treasurer at every session thereof, and have been received by it as satisfactory; and said legislature has always omitted to take any action looking to the taxation of said lands or the forfeiture of respondent's franchises, but has received and accepted said reports as satisfactory. All the franchises appertaining to the operation of the line of railroad from Minneapolis to the state line have been, at all times since its completion as aforesaid, actively exercised and used by the Milwaukee & St. Paul Railway Company, and said railroad has been constantly operated. All of the other franchises of respondent have at all times been actively exercised by respondent, whose corporate organization has been constantly kept alive, and annual elections of directors and other officers contemplated by its charter have always been regularly held by its stockholders." But the respondent has not, since such sales, owned, built, maintained or operated any railway in this state or elsewhere.

2.

As to the Hastings & Dakota Railway Company: This corporation was originally created by the name of the Hastings, Minnesota River, & Red River of the North Railroad Company, by act of the territorial legislature of February 20, 1857, (Laws 1857, c. 39;) and by the act of March 3, 1866, (Sp. Laws 1866, c. 12,) it was authorized to construct a line of railway from the city of Hastings, in Da-

kota county, towards Glencoe in McLeod county, and in the direction of Redwood Falls in Redwood county on the Minnesota river, and thence westerly to the western boundary of the state, through Redwood county, in the direction of the junction of the Big Sheyenne river with the Missouri river, with power to build a branch to the Red River of the North, and also to Stillwater in Washington county. By act of congress of July 4, 1866, a grant of ten sections per mile was made to aid in the construction of a railway from Hastings to the western boundary of the state, on a line to be fixed by the legislature, and by act of March 7, 1867, (Sp. Laws 1867, *c.* 9,) the state conferred this grant upon the respondent. This act contained the same provisions exempting the railway and its appurtenances from taxation, and exempting the land grant from taxation until the land should be contracted to be sold, and requiring the company to pay a percentage of the gross earnings of its railway as the consideration of such exemptions, which are found in the acts relating to the Minnesota Central Railway Company. The act of 1867 provided that upon the company's failure to comply with any of its provisions, it should forfeit all lands, rights, and franchises acquired by virtue of the act, "except any land that it may have received for any portion of said road completed by it as required by the provisions of this act."

About July 1, 1872, the respondent, having completed that portion of its railway between Hastings and Glencoe, sold and conveyed it to the Milwaukee & St. Paul Railway Company, with the rolling stock, equipment, appurtenances, and franchises appertaining to the portion of railway thus conveyed, but expressly reserving and excepting the land grant and the respondent's franchise to be a corporation. Ever since the sale this portion of respondent's railway has been owned and operated by the purchaser. About January 1, 1880, the respondent sold and conveyed to the same purchaser, by its new name of the Chicago, Milwaukee & St. Paul Railway Company, that part of its railway, with its equipment, appurtenances, and franchises, extending from Glencoe to Big Stone lake on the western boundary of the state, with the same reservation and exception of the land grant and the franchise to be a corporation; and ever

since such sale and conveyance this part of its railway has been owned and operated by the purchaser. On December 8, 1882, the respondent sold and conveyed to the same purchaser all its right, title, and interest in, and all its rights and privileges pertaining to, a line of railway from Minneapolis south-westerly to a point on the main line of the Hastings & Dakota railway at or near Benton in Carver county, and ever since such conveyance the line so conveyed has been owned and operated by the purchaser. The lines of railway embraced in these two conveyances comprised all the railway ever owned, constructed, used, or operated by the respondent, and since the sales the respondent has not owned, maintained, or operated any railway in Minnesota or elsewhere, or carried on any railway business.

At the time of these transfers the purchaser owned and operated two lines of railway; one of them that line formerly belonging to the Minnesota Central Railway Company, and the other that known as the "river road," extending from St. Paul to La Crescent, neither of which was a competitor with respondent's road; and the road of respondent could be better and more advantageously operated, both for the interest of its owners and the public, in connection with and under the same ownership as these other roads than independently. Both of these other roads had been built by companies chartered by this state, had been bought by the Chicago, Milwaukee & St. Paul Company a number of years before the sale by respondent in the same manner that it bought respondent's road, and for several years prior to the sale by respondent had been publicly owned and operated by the purchaser, and were being thus operated at the time of the sale by respondent, with full knowledge and assent of the legislature of the state.

Immediately after each purchase, and ever since, the purchaser assumed to pay and paid into the state treasury the percentage of gross earnings required to be annually paid by the respondent on that part of its line so transferred, and made annual reports of gross earnings, describing the line of road as its Hastings and Dakota division extending from Hastings to Glencoe, which were duly laid before the legislature annually by the state treasurer in his annual report, were accepted by the legislature as satisfactory, and the mon-

.eys so paid into the treasury were appropriated by the legislature to the service of the state. During this period the purchaser also made annual reports to the railroad commissioner of the state, as required by law, stating in detail the full description of its roads in Minnesota, and reporting that part of respondent's road so transferred to it as owned and operated by it. These reports also were duly laid before the legislature by the commissioner in his annual reports, and were accepted by it as satisfactory; and especially in its report of 1873, after the first transfer, the purchase, the price, and .all facts in regard to it were reported to the commissioner and included in his report to the legislature.

After the sale in 1872, as fast as the road west of Glencoe was completed in the sections required by law, conveyances of the lands embraced in its land grant were made from time to time by the governor as required by respondent's charter, and reports of such conveyances were annually laid before the legislature by the land commissioner in his annual reports, and were received by the legislature as satisfactory, with full knowledge of the sale and transfer.

By an act of February 28, 1876, (Sp. Laws 1876, *c.* 115,) the legislature extended the time for grading and completion by the respondent of its line of railway, and provided for conveyances of portions of the land grant upon the completion of sections of the railway, and that the respondent should be entitled to the same rights, privileges, and franchises as if its line had been constructed and put in operation within the time theretofore limited by law; and with reference to the line of railway already built or to be built, it was provided in and by the act "that said railroad company, its successors or *assigns,* shall at all times transfer over its line of railroad passengers and freight at just and reasonable rates." This act was duly accepted by the respondent, which proceeded to and did complete and construct the remainder of its line on the faith of it at an expenditure of a large sum of money. By the act of February 23, 1877, (Sp. Laws 1877, *c.* 218,) these provisions of the act of 1876, extending the time for completion by the respondent of its line of railway, and providing that the company should have the same title to receive its granted lands, and the same rights, privileges, and

franchises as if its line had been built and put in operation within
the time theretofore limited for that purpose, were repeated, and it.
was provided that for any failure to complete the line within the time
thus extended, it should forfeit the lands, property and franchises
pertaining to the unbuilt portion of the road.   In this act the same
provision was made in regard to the carrying of freight and passen-
gers on reasonable terms by the company, its successors or *assigns,*
as in the act of 1876.   This act also was accepted by the respond-
ent, which completed its line at large expense in reliance upon it.   A
similar act extending the time for completion by respondent of its
line of railway was approved February 8, 1878, (Sp. Laws 1878, c.
234,) the legislature then having full knowledge of the transfer al-
ready made.   By this last act further provisions were made for the
taxation of lands which should have been contracted to be sold by
the company, the act providing, however, that in enforcing the col-
lection of the taxes thereon the title or interest of the company
should be in nowise impaired or affected, but that the improvements.
on the land and all the interest of the purchaser or lessee therein.
should, in case of default in payment of taxes, be sold to satisfy the
same.   This act required an acceptance to be filed by the company
within a limited time in the office of the secretary of state, which ac-
ceptance was duly filed by the respondent.   In reliance on all these
acts, the respondent continued the construction of its road and com-
pleted it within the time limited, and, besides, constructed its road
from Minneapolis to Benton Junction, which it was not required to
do by its charter, which gave it the power to construct the branch
but *imposed no duty in that respect.*

Since the completion of this branch, in 1882, no objection to the
sale or any of the transactions mentioned has ever been made by the
legislature.   No tax has been imposed on respondent's land, but a
payment of the percentage of gross earnings of the line as fast as.
completed and put in operation has been required of and has been
annually made by the Chicago, Milwaukee & St. Paul Railway Com-
pany, and the money paid has been received into the state treasury,
and has been disposed of by the legislature.   In the conveyances to
the Chicago, Milwaukee & St. Paul Railway Company of its main.

line from Hastings to the state line at Big Stone lake, respondent, as before stated, excepted from each conveyance its land grant and also its franchise to be a corporation.   In every subsequent report of the railroad commissioner to the legislature it is stated and appears that the line so conveyed is owned and operated by the purchaser. Prior to the conveyance in 1882 of the branch from Minneapolis to Benton Junction, the legislature, by act approved March 4, 1881, (Sp. Laws 1881, *c.* 221,) authorized the Chicago, Milwaukee & St. Paul Railway Company (described in the act as a Wisconsin corporation) to purchase, maintain, and operate in the state of Minnesota, subject to its laws, any railroad or railroads which can be operated in connection with any railroad now or hereafter owned or operated by that company as an extension or branch thereof, and to that end it was declared in the act that such corporation shall have and possess, and exercise and enjoy, all the rights, powers, and franchises, privileges and immunities, including the power of eminent domain, conferred by the laws of the state upon domestic railway companies.

*Wm. J. Hahn,* Attorney General, and *J. M. Martin,* for the State.

*Gordon E. Cole,* for respondents.

VANDERBURGH, J.   Upon the facts admitted on the face of the record, the attorney general applies for judgment dissolving these corporations, on the ground of non-user of their franchises, and a suspension of their business as railroad companies.   The information shows, and the answers admit, that the respondents have heretofore sold and conveyed the lines of road authorized by their charter, and by them constructed thereunder, and for more than four years they have neither owned nor operated any railroad in this state.   It further appears that they claim still to be corporations exercising certain other franchises, to wit, the right to hold and dispose of lands granted upon the construction of the roads, or designated portions thereof, exempt from all taxation.   The attorney general insists that the corporations have abandoned the chief purpose and business for which they were organized, and endowed with grants and chartered privileges, and that the suspension of the exercise of their principal franchises amounts to a non-user, for which a forfeiture should be declared.

It is the common-law rule that a private corporation created by the legislature may lose its franchises by a misuser or non-user of them, and they may be resumed by the government under a judgment upon a *quo warranto* to ascertain and enforce the forfeiture. This is a tacit condition annexed to the creation of every such corporation, (*Terrett* v. *Taylor*, 9 Cranch, 43, 51, 52; *People* v. *Bank of Hudson*, 6 Cow. 217;) and by Gen. St. 1878, c. 76, § 11, it is provided that, whenever any railroad corporation shall "for one year suspend the lawful business of such corporation, such company or corporation shall be deemed to have forfeited the rights, privileges, and franchises granted by any act of incorporation or acquired under the laws of this state, and shall be adjudged to be dissolved." Gen. St. 1866, c. 76, § 11; Id. c. 79, § 2; Pub. St. 1858, c. 67, § 8.

To this end an information may be filed and prosecuted to judgment; and it was held in *State* v. *St. Paul & Sioux City R. Co.*, 35 Minn. 222, (28 N. W. Rep. 245,) that a forfeiture under section 11, chapter 76, just quoted, might be enforced by *quo warranto* in this court. But the general rule is that a corporation is not to be deemed dissolved until a forfeiture is judicially ascertained and adjudged, (*People* v. *Hillsdale, etc., Turnpike*, 23 Wend. 254; *Bradt* v. *Benedict*, 17 N. Y. 93; *Minnesota Cent. Ry. Co.* v. *Melvin*, 21 Minn. 339;) and a cause of forfeiture can only be taken advantage of by the state in a direct proceeding for the purpose. *Heard* v. *Talbot*, 7 Gray, 113, 120. In a forfeiture for neglect or non-user of corporate privileges at the common law, the court was left to determine whether, under the circumstances of every particular case, the acts and omissions had been such, or had been continued for such length of time, as to warrant a judgment. *Harris* v. *Mississippi Valley, etc., R. Co.*, 51 Miss. 602; *Hart* v. *Boston, etc., R. Co.*, 40 Conn. 524. But the statute referred to expressly provides for a judgment of dissolution of a railroad corporation "which for one year suspends the lawful business of such corporation." This leaves no room for any discretion on the part of the court, where this fact clearly appears, to refuse judgment of forfeiture. The terms of the statute admit of no excuse or explanation. *People* v. *Northern R. Co.*, 53 Barb. 98, 123; *State* v. *Building Ass'n*, 35 Ohio St. 258, 264; *Bradt* v. *Benedict*, 17 N. Y.

93. The non-user complained of must undoubtedly relate to matters which are of the essence of the contract between the corporation and the state. *Com.* v. *Commercial Bank*, 28 Pa. St. 383, 389; *Attorney General* v. *Petersburg, etc., R. Co.*, 6 Ired. 456, 469; 2 Morawetz, Corp. § 1025.

These railroad corporations were created by the state to maintain, have, use, and operate railroads. This was their lawful business, and the end and object for which they were created, and the consideration and condition upon which they were given their franchises and special privileges, and endowed with land grants. 2 Morawetz, Corp. (2d. Ed.) §§ 1114, 1115. It would seem, therefore, that a suspension of such business by the corporations would necessarily bring the case within the statutes, notwithstanding their reservation of the land grants and franchises upon the sale or transfer by them of the railroads. The right to acquire and dispose of these lands, and the right to hold the same in the mean time exempt from taxation, are corporate franchises, but ancillary and subordinate to the main purpose and object for which the companies were chartered. The failure to discharge their duties to the public, and the non-user or suspension of their principal business as railroad companies, are a sufficient ground for an absolute forfeiture of their corporate rights. *Ward* v. *Sea Ins. Co.*, 7 Paige, 294; *Matter of Jackson Marine Ins. Co.*, 4 Sandf. Ch. 559; *Mickles* v. *Rochester City Bank*, 11 Paige, 118, 126, (42 Am. Dec. 103;) *Attorney General* v. *Petersburg, etc., R. Co.*, 6 Ired. 456, 469; *Heard* v. *Talbot*, 7 Gray, 113, 120.

By the consent of the state such subordinate franchises may exist and continue to be exercised, independently of the franchises to construct and operate railroads. *State* v. *St. Paul & Sioux City R. Co.*, 35 Minn. 222, (28 N. W. Rep. 245.) But the right to exercise such franchises cannot lawfully survive after a sale of the railroads, and a suspension by the corporations of their principal business, unless by the authority and consent of the state, expressed or clearly implied; and the consent, ratification, or waiver must be through legislative enactments. The state is not, in such case, bound by the acts of its executive officers. *People* v. *Phœnix Bank*, 24 Wend. 431, (35 Am. Dec. 634;) *People* v. *Plank-road Co.*, 27 Barb. 458; Ang.

& A. Corp. § 777; *People* v. *Kingston Turnpike Road Co.*, 23 Wend. 193, 212, (35 Am. Dec. 551.) It is admitted that, in the transfer of the railroads in question, the lands were separated and reserved to the respondents, and the grant and conveyance limited to the railroads and the property appurtenant thereto, and that a portion of the granted lands still remain undisposed of by them.

The discussion in these cases is therefore narrowed down to the question whether the legislature has authorized or consented to such a separation of corporate franchises and the continued existence of the corporations for the purpose of holding and disposing of the granted lands, notwithstanding they had ceased to hold or operate any railroads, or has waived the forfeiture resulting from the suspension by them of their lawful business as railroad companies. The contention of the respondents is that such waiver appears from special acts, and the course of legislation on the subject.

1. In respect to the case of the Minnesota Central Railway Company. The proportion of the land grant falling to the Minneapolis & Cedar Valley Railroad Company, in aid of the construction of the line finally built by the respondent, the former company was authorized to take, under the act of May 22, 1857, (Laws 1857, Ex. Sess., c. 1,) which provided that the company should be capable in law of taking and holding such lands in fee-simple, and that said lands so granted should be exempt from taxation until the same should be sold and conveyed. After the foreclosure by the state, all the franchises, rights, and property theretofore belonging to the Minneapolis & Cedar Valley Railroad Company were transferred by the legislature to the respondent, and the lands set apart for that line of road were authorized to be conveyed to the respondent, upon the construction thereof, as provided in the Special Laws of 1864, c. 2; and it was also therein provided that the lands so granted should be exempt from taxation until conveyed or contracted to be sold by the company. *Minnesota Cent. Ry. Co.* v. *Melvin*, 21 Minn. 339. The respondent thereafter, in pursuance of its charter as amended, completed the construction of the road to Austin, in the county of Mower, about the year 1866, and was thereupon entitled to a conveyance of the land grant appurtenant to so much of that line of road. The McGregor Western Railway Com-

pany was in the mean time engaged in constructing a railroad from McGregor, in the state of Iowa, to Austin, in this state, at which point it was authorized to make a connection with the Minnesota Central railway, by the act of February 24, 1866, (Sp. Laws 1866, c. 8.) And by the act of March 7, 1867, (Sp. Laws 1867, c. 8,) the same company was authorized to extend its line of road by way of Austin to Owatonna, and by section 3 of the act of 1866, just referred to, it was provided that, upon filing a copy of its articles of incorporation in the office of the secretary of state, that company should be vested with the powers of a domestic corporation, and thereafter become authorized, under the general provisions of Gen. St. 1866, c. 34, § 39, to purchase the road of the respondent, or any portion thereof, being a "line continuous with its own."

It is admitted that its articles of incorporation were duly filed in pursuance of the act of 1866, and the purchase of a part of respondent's road was thereafter consummated in 1867, under which the latter sold and conveyed its line of railroad from Minneapolis to Austin, saving and reserving, however, in the conveyance, its right to the lands and its right to be a corporation. Soon after, the McGregor Western Company transferred its purchase to the Milwaukee & St. Paul Railway Company. It may be conceded, therefore, that the McGregor Western Company, by virtue of the general provisions of the statute referred to, was authorized to acquire that portion of respondent's road; and the validity of the subsequent transfer thereof to the Milwaukee & St. Paul Company, which is not disputed, is not a proper subject of inquiry in this proceeding. The respondent afterwards completed the remaining portion of its road from Austin to the state line, which was thereafter, in 1870, also transferred, in like manner, to the Milwaukee & St. Paul Railway Company, since which time the respondent has not operated any portion of its railroad, but has continued to hold and enjoy the franchise pertaining to the lands acquired by it in aid of the construction of the road, a limited amount of which still remains undisposed of.

By the act of February 29, 1868, (Sp. Laws 1868, c. 5,) the legislature expressly authorized the governor "to certify to the secretary of the interior the construction and completion of that part of the

road of the Minnesota Central Railway Company from Minneapolis to Austin, and to execute, in the name of the state of Minnesota, under the great seal thereof, a deed in fee-simple to said company of so many and such portions of the lands appertaining to the completed portion of said road as the state is entitled to; * * * and, whenever the congress of the United States shall authorize the conveyance or appropriation of the residue of the lands granted to said state to aid in the construction of said road, the governor shall execute to said company a deed in fee-simple of the remainder of such lands." And by the same act the legislature extended the time for the completion of that portion of the original line from Austin to the state line for the term of two years. This action of the legislature was with knowledge of the previous sale to the McGregor Western Railway Company of the line previously built. This act was, of course, a waiver of any forfeiture for any past misuser or non-user of corporate franchises up to that time, and an express recognition of the corporate existence and authority to complete the road, and continue in the exercise of its franchises as a railroad company. What effect its transfer of the balance of the road by it constructed to the state line, and the subsequent total suspension of its business as a railway company, may have upon its right to continue its corporate existence for the purpose of holding and disposing of the granted lands, we will discuss later in this opinion.

2. In respect to the Hastings & Dakota Railway Company. We find no legislative authority or sanction for the suspension, by the respondent, of its franchises, business, and duties as a railroad company, and the continued, separate, and independent exercise of the business of a land company for the disposition of the land grant acquired by the corporation. When the respondent had constructed that portion of its road east of Glencoe, it sold and conveyed the same to the Milwaukee & St. Paul Railway Company, with its rolling stock, equipment, etc., appertaining to that portion of its road, and thereafter wholly ceased to operate the same, but reserved all the lands earned by and granted to the respondent, under its charter, for the construction thereof, and also its corporate franchise; and afterwards, upon the completion of its line to Big Stone lake, it in like manner

sold and transferred the remaining portion thereof, with like reservations, to the same grantee, which has ever since continued to maintain and operate the entire line.   The respondent also constructed an independent branch road from Minneapolis to Benton, in the county of Carver, which it also transferred to the Milwaukee road in the year 1882, since which time the respondent has operated no railway whatever, and has wholly suspended the exercise of its franchises as a railway company; but claims still to be a corporation, entitled to exercise its franchises to hold and dispose of its granted lands exempt from taxation.

The charter, and amendments thereto, secured to respondent the benefit of the lands granted by congress to aid in the construction of the main line, referred to, from Hastings to the west line of the state; and these lands were to be transferred to the company "as soon and as often as ten miles of said road shall be constructed and completed; * * * and the grant shall not become void, nor the company be dissolved, by the non-completion of the entire extent of said road, but shall be good and valid, to all intents and purposes, for the parts or portions of said road completed, and the said company shall continue and survive to that extent."   Sp. Laws 1866, *c.* 12, § 15; Sp. Laws 1867, *c.* 9, § 4.   Undoubtedly the company acquired an absolute right to the lands actually earned as the construction of the road progressed; but these provisions involve no recognition or sanction by the state of its right to suspend its active exercise of the franchises of a railway company as to the completed roads, or otherwise.   The provisions relating to taxation, and under which the exemption is claimed, (Sp. Laws 1867, *c.* 11, § 19,) are, substantially, that the percentage upon the gross earnings therein required to be paid to the state should "be in full of all taxation and assessment whatever;" "and, for securing to the state the payment of the aforesaid percentum, it is hereby declared that the state shall have a lien upon the railroad, and upon all the property, estate, and effects of said company, whether real, personal, or mixed."   These provisions relate wholly to the obligations and duties of the respondent; and the granted lands are a part of the company's property for which a peculiar mode of taxation is thus provided, and are a part of the corporate property

upon which a lien is thus secured to the state. The charter, clearly, does not contemplate that the title or ownership of these lands should be severed from the proprietorship of the road, or any division of the franchises of the company, and we find nothing in any subsequent legislation sanctioning the sale to and operation of the railroad by another company, and the survival of the respondent as a separate organization, entitled to exercise the separate franchise of holding and disposing of its lands; and we are unable to see how any such arrangement could be valid without the sanction of the legislature. *State* v. *St. Paul & Sioux City R. Co.*, 35 Minn. 222, (28 N. W. Rep. 245.) The right to assign corporate franchises is itself a franchise, and must be the subject of legislative grant.

The counsel for respondent, however, rely upon subsequent acts of the legislature, extending the time for the completion of the unsold portion of the line, as evidence of the legislative sanction and approval of the past acts of the company. But, until a forfeiture was adjudged, the company might exercise its franchises, and proceed with the construction of the road within the time fixed by the legislature; and it will be borne in mind that the *gravamen* of the charge here is not misuser, but non-user,—a suspension of its business as a railroad company by the respondent. The time limited for such purpose having expired, an act was passed February 28, 1876, (Sp. Laws 1876, c. 115,) extending the time for the completion of the road by the respondent. Undoubtedly this was so far a recognition of the continued existence of the company as a railway corporation. But the object of the statute clearly appears from the preamble, which recites the default of the company in failing to construct the railroad "according to the terms and conditions of the several acts of the legislature of the state of Minnesota granting the right to said railroad company to construct said line of railroad, and granting to said company lands to aid in such construction;" reciting also the importance of an early completion of the road, and the expressed willingness of the company to complete and put it in operation within a reasonable time.

Stress is also laid upon the fact that in the acts of 1876, 1877, and 1878, referred to in the answer, which also still further extended the

time for the construction of the road, clauses are inserted requiring the company, "its successors or assigns," to carry freight and passengers at reasonable rates. Sp. Laws 1876, *c.* 115, § 4; Sp. Laws 1877, *c.* 218, § 4; Sp. Laws 1878, *c.* 234, § 4. This was intended as a regulation, significant of the policy of the state, to be permanently ingrafted on the charter, into whosesoever hands it might fall; but it conferred no new franchises or rights upon the *corporation,* and it cannot be invoked as legislative authority or sanction for the subsequent transfers, suspension of business, and continued existence as a corporation by the respondent. And this is the more evident from the fact that, in each of these acts, provisions for an absolute forfeiture without judicial decree in case of default, and for a redisposition of the franchises and road, were inserted.

The Milwaukee & St. Paul Railway Company was then a foreign corporation, which had no right, under the laws of this state, to purchase or take an assignment of respondent's railroad and franchises. It was not so authorized by Gen. St. 1866, *c.* 34, § 39, (Gen. St. 1878, *c.* 34, § 69,) because that applies to domestic corporations only, or corporations clothed with like powers by the state. And the rights and privileges conferred on that corporation by Sp. Laws 1872, *c.* 93, were expressly, by that act, limited to the line of the St. Paul & Chicago Railway Company, the sale of which was confirmed. Such authority was for the first time conferred, in so far as we are able to find, by Sp. Laws 1881, *c.* 221, referred to in the answer. Nevertheless, it appears that the respondent, having then completed the main line of its road to the west boundary of the state, thereupon, in January, 1880, as before stated, sold the division west of Glencoe to the Milwaukee & St. Paul Railway, reserving its land grant and right to be a corporation. No subsequent action of the legislature is relied on, showing any ratification of such transfer or waiver by the state. Subsequently, in 1882, the branch from Minneapolis to Benton was sold to the same company without reservation, as we presume there was no land grant connected with it, and since that time the respondent has suspended its lawful business as a railway corporation. It was not material that the last sale was authorized by the act of 1881. It saved to the respondent no right to continue

its corporate existence. *State v. St. Paul & Sioux City R. Co., supra.* And, surely, the previous voluntary arrangement entered into between these corporations in respect to the construction and conveyance of the railroad and its appurtenances, and the reservation to respondent of the corporate franchises and lands as alleged, can be no sufficient answer to the charge in this information. The charter never contemplated such a division of the corporate franchises, and it has never been authorized or sanctioned by the legislature. No purpose connected with the object of the respondent's organization, or its proper business as a railway corporation, is any longer served by its continued existence. The case is entirely different from that of the sale of the St. Paul & Sioux City Railroad Company, where the legislature, in a special act, authorized the transfer, and, *ex industria*, provided that the right to continue to exercise its corporate franchises should be saved to the corporation. *State v. St. Paul & Sioux City R. Co., supra.*

3. From the foregoing it is apparent that the transfer of the section of its road from Austin to the state line, and the entire suspension of its lawful business and functions as a railway corporation by the respondent, the Minnesota Central Railway Company, were equally without such legislative sanction as to bar these proceedings. It was the closing out and cessation of its railroad business, and was so intended to be. It is no answer or excuse that the Milwaukee Company has continued to operate the roads, and has paid the taxes required by the charters of these respondents. It cannot and does not, we presume, claim to be operating them under such charters. These facts do not affect the question of the suspension of corporate duties by respondents. *Lake Ontario Shore R. Co. v. Curtiss,* 80 N. Y. 219; *People v. Northern R. Co.,* 53 Barb. 98, 123; *Com. v. Tenth Mass. Turnpike Co.,* 5 Cush. 509.

In *Conro v. Port Henry Iron Co.,* 12 Barb. 27, 63, the defendant corporation leased its works for the term of two and one-half years for the purpose of *closing out* its business, but the business was carried on as before the lease, and the court held, per Willard, J., that, conceding the lease to be binding on the company, it suspended for two years and six months its ordinary and lawful business, and was

an act of self-destruction. See *People* v. *Bank of Hudson,* 6 Cow. 217, 219, 220; *State* v. *Commercial Bank,* 13 Şmedes & M. 569, (53 Am. Dec. 106;) *State* v. *Rives,* 5 Ired. 297, 309; 2 Morawetz, Corp. § 1115; *State* v. *Hartford & N. H. R. Co.,* 29 Conn. 538, 547.

Nor is it material that the records of the executive department of the state disclose the fact that the Milwaukee Company claim to own, and have in fact operated, these roads as a part of its system, or that the legislature, having notice of these records, have omitted to take action in the premises. The Milwaukee Company has paid its own taxes on its gross earnings, and has discharged its own public duties; and in the mean time the respondents have paid no taxes, nor discharged any duties to the public. The remedies of the state, under the statute, have continued to exist, and have not been suspended by the legislature. No further legislation was needed to secure its rights, and the absence of it is no waiver, and the respondents have suffered no prejudice from the leniency of the state.

The fact that authority is given by section 2 of chapter 93, Sp. Laws 1872, before referred to, authorizing the Milwaukee & St. Paul Company to make "a continuous connection, through the city of St. Paul," to and with "its present line of railway in Dakota and Hennepin counties heretofore belonging to the Minnesota Central Railway Company," even if construed to be a recognition of the title of that company to the whole line of the last-named company, is immaterial upon the question here under consideration. It is evident that the legislative mind was not directed to the *status* of the Central Railway Company, or the terms and conditions of its last transfer to the Milwaukee Company, and it involves no waiver of its right to proceed against the former company on account of a suspension of its functions as a railway corporation. It is admitted that, as between the parties at least, these roads have both been transferred to the Chicago, Milwaukee & St. Paul Railway Company, which has for years controlled and operated the same, and is at present, since the act of 1881, recognized as a domestic corporation, and these respondents have in fact, as corporations, retired from the management or operation of any railroads, and disclaim any ownership or interest therein. The rights of the grantees are not in issue here, and may never be ques-

tioned. The reference to the acts of the legislature on the subject is made for the purpose of showing that there has been no legislation limiting or waiving the effect or operation of Gen. St. 1878, c. 76, § 11, under which the proceeding is brought, so as to warrant the court in disregarding or holding the provisions of that section inapplicable to these respondents. Whether, if the information proceeded upon common-law grounds, the court would be warranted in applying the rule less strictly, in view of the facts and circumstances of this case, we need not determine. In *Bradt* v. *Benedict, supra*, Selden, J., referring to a similar statute in New York, treating it as supplementary to the common law, says: "The statute goes much farther, and provides that a mere suspension of the ordinary business of the corporation shall operate as a surrender."

Without attempting a discussion in general as to what acts or conduct may or may not amount to a suspension of the lawful business of a railroad company further than is applicable to the cases before us, we see no escape from the conclusion that, upon the record presented, the state is entitled to judgment of forfeiture, as asked in the information in each of these cases, and it is accordingly so ordered.

BERRY, J., (*dissenting.*) I understand my brethren to hold that the sale of that part (branch) of the Hastings & Dakota road lying between Minneapolis and Benton Junction was authorized by the act of 1881. This appears to me to be the fact; but, as no part of the land grant appertained to this branch, it is not very important in this case, except as going to show that, the sale and consequent non-user of the branch being authorized by law, neither would furnish any ground for forfeiting any franchises of the Hastings & Dakota Company, or, at most, none except such as that sale would deprive the company of power and right to use.

I dissent generally from the conclusions arrived at by my brethren as respects the rest of the Hastings & Dakota road, being that part of it which lies between Hastings and Ortonville. As to this, I think its non-user by the Hastings & Dakota Company in person, (if I may use that phrase,) and its maintenance and operation by the Chicago, Milwaukee & St. Paul Company, have been acquiesced in, assented

to, and sanctioned by both the legislative and executive departments of the state government, from time to time, ever since the construction of its different portions, respectively, being from 4 to 15 years last past.

As to that part of the Minnesota Central road lying between Minneapolis and Austin, I understand my brethren to agree, as I do, that the sale to the McGregor Western was expressly authorized by various acts of the legislature; so that, as in the case of the Hastings & Dakota branch, I see no reason why such sale, or the consequent non-user by the Minnesota Central, should at most furnish any ground for forfeiting any franchise of the latter company except such as that sale would deprive it of power and right to use; and, as to this part of the Minnesota Central, there has been a like acquiescence, assent, and sanction as in the case of the Hastings & Dakota, and even more explicit as respects the sale, the non-user by the Central, and the maintenance and operation by the Chicago, Milwaukee & St. Paul, for nearly 20 years, and, as to the 10 or 12 miles lying between Austin and the state line, for more than 15 years.

In my judgment, this conduct on the part of the state waives any right which it might have had to demand a forfeiture of the *entire* franchises of these companies on account of the alleged sales and non-user of the roads. If the sales are invalid and abortive, so that the roads are still owned and held by the Hastings & Dakota and Minnesota Central Companies, respectively, it is not perceived why such sales, or the merely *personal* non-user of the roads by these companies, should call for such forfeiture, so long as the non-user has been acquiesced in, assented to, and sanctioned by the state. But, conceding that the sales are valid and operative, so that there is not only a non-user by the Hastings & Dakota and the Minnesota Central Companies of what may for brevity be called their railroad franchises, and that, as they have no further use for them, and nothing for which they can use them, they may as well be forfeited, I can conceive of no reason why, in view of the state's acquiescence, assent, and sanction, before mentioned, these companies should be deprived of the franchise to hold and sell their lands, upon the terms, as to taxation and otherwise, upon which they were granted

to them; or why, for this purpose, they should not be permitted to retain the franchise of corporate existence, leaving the state, on the other hand, to enjoy the right to the commutation of taxes now secured by constitutional amendment.

With respect to the statute relied on as *requiring* a forfeiture when a corporation has suspended its lawful business, I have only to say that it cannot have reference (so as to *require* an entire forfeiture) to a case in which the suspension is partial, and sanctioned by the state.

For these reasons I dissent from the conclusion reached in the majority opinion. I content myself with briefly stating the *general results* which I have arrived at in the case, because a full and detailed statement of the facts and grounds upon which I stand, would render this (which is only a dissenting) opinion unjustifiably voluminous. A full presentation of the facts will be found in the pleadings, and in the briefs of counsel.