STATE OF MINNESOTA, *ex rel.* Moses E. Clapp, Attorney General, *vs.* MINNESOTA THRESHER MANUFACTURING COMPANY.

'March 7, 1889.

**Constitution—Quo Warranto—Trial by Jury.**—Proceedings upon information in the nature of *quo warranto* belong to the class designated "remedial cases" in section 2, art. 6, of the constitution of the state, and are not included in the class denominated "cases at law" in section 4, art. 1, of the same instrument, in which trial by jury is demandable as of right.

**Corporations under Act of 1873—Powers—Companies for Manufacturing and Other Business.**—No corporation can be organized under Laws 1873, *c.* 11, (Gen. St. 1878, *c.* 34, §§ 120–143,) except for an exclusively manufacturing or mechanical business. If the purpose for which a corporation is formed, as stated in its articles of association, is to carry on a manufacturing or mechanical business, and also some other and distinct kind of business, not properly incidental to or connected with the former, it will belong to the class of corporations authorized to be formed under Gen. St. 1878, *c.* 34, title 2, (sections 109–119,) although the articles recite that it is formed under the act of 1873.

**Quo Warranto against Corporation—Office of Writ.**—The object of proceedings by *quo warranto* against a corporation being to protect public interests, to warrant a forfeiture of corporate franchises for misuser the misuser must be such as to work or threaten a substantial injury to the public.

**Same—"Franchises" and "Powers"—Remedy for Ultra Vires Acts.** "Franchises" and "powers" distinguished. Acts *ultra vires,* or in excess of powers, are not necessarily a misuser of franchises, such as will warrant their forfeiture. To justify such forfeiture the *ultra vires* acts must be so substantial and continued as to so derange or destroy the business of the corporation that it no longer fulfils the end for which it was created. *Ultra vires* acts may be such as to justify interference by the state by injunction to prevent a continuance of the excess of powers, while they would not be a sufficient ground for a forfeiture of the corporate franchises in proceedings by *quo warranto.*

**Same—Acts affecting merely Creditors and Stockholders.**—If the unauthorized acts affect merely stockholders and creditors who have an adequate legal remedy, the state will not interfere. Demurrer to the answer overruled, and information dismissed.

*Quo warranto.*

*Moses E. ·Clapp*, Attorney General, *Gordon E. Cole, James N. Castle*, and *Horace G. Stone*, for relator.

*Flandrau, Squires & Cutcheon* and *Henry D. Hyde*, for respondent.

MITCHELL, J.[1]   Proceedings upon information in the nature of *quo warranto*, filed by the attorney general against respondent, to show cause why its franchises should not be declared forfeited and the corporation dissolved.   In justice to this court, as well as to the attorney general, it is proper at the outset to correct an error into which respondent's counsel have fallen.   They have repeatedly asserted, both in their briefs and in their oral arguments, that the attorney general has filed a disclaimer of any interest in these proceedings on his own part or on part of the state.   An inspection of the statement filed by him will show that it will bear no such construction.·   As such proceedings are in the nature of a public prosecution, having for their object the recovery to the state of a usurped or forfeited franchise, and not to redress private grievances, no one but the attorney general has authority to institute or prosecute them, it being exclusively for him to determine when public interests require them to be instituted. Therefore, had he moved to dismiss, as he had the undoubted right to do, or had he stated that this was not a case which public interests required to be prosecuted, we would undoubtedly have dismissed, notwithstanding objections by private parties.   But the attorney general having done neither, and the information being filed by him in his official capacity, this court did the only thing it could do under the circumstances, viz., to entertain the proceedings and determine them according to law.

1. It is objected that this court has no original jurisdiction in proceedings of this nature.   In a number of cases since the enactment of chapter 58, Laws 1876, (Gen. St. 1878, c. 63, § 1,) the existence of such jurisdiction has been taken for granted without question.   *State* v. *Sharp*, 27 Minn. 38, (6 N. W. Rep. 408;) *Barnum* v. *Gilman*, 27 Minn. 466, (8 N. W. Rep. 375;) *State* v. *Dowlan*, 33 Minn. 536, (24 N. W. Rep. 188;) *State* v. *Harrison*, 34 Minn. 526,

[1] Gilfillan, C. J., took no part in this case.

(26 N. W. Rep. 729.) Twice the point has been considered and de-
cided. *State* v. *St. Paul & Sioux City R. Co.;* 35 Minn. 222, (28
N. W. Rep. 245;) *State* v. *Minn. Central Ry. Co.,* 36 Minn. 246, (30
N. W. Rep. 816.) Under such circumstances, we would ordinarily
consider a question as foreclosed. But inasmuch as it is an impor-
tant one, involving constitutional rights, and respondent's counsel
have placed their contention upon grounds not heretofore distinctly
presented to this court, to the discussion of which they have brought
great learning and exhaustive research, we have thought proper to
re-examine the subject.

Respondent's position is that the act of 1876, assuming to give this
court original jurisdiction in *quo warranto,* is unconstitutional. Their
line of argument is—*First,* that this court has no jurisdiction, for
any purpose, in any case in which trial by jury is demandable as of
right; *second,* that trial by jury is demandable as of right in all cases
in which such right existed at common law at the time of the adop-
tion of the constitution of the state; *third,* that at common law a
party had a right to trial by jury in proceedings upon information in
the nature of *quo warranto.* Counsel have gone very exhaustively
into the discussion of the nature of the ancient and obsolete writ of
*quo warranto,* and of its more modern substitute, an information in
the nature of *quo warranto,* and of the mode of trial of such proceed-
ings at common law. But, for present purposes, all we deem neces-
sary to consider are the provisions of our own constitution in con-
nection with the right of trial by jury as it existed in the territory
of Minnesota at the time of its adoption, and the construction which
has been put upon these constitutional provisions by this court.

And, first, it must be remembered that the statutes then, as now,
only gave the right of trial by jury in actions for the recovery of
money or of specific real or personal property, or for divorce for
adultery. Rev. St. 1851, *c.* 71. The writ of *quo warranto,* and pro-
ceedings upon information in the nature of *quo warranto,* had been
abolished; relief of that nature being obtained only in a civil action.
Rev. St. 1851, *c.* 80. Such an action would not have been triable by
a jury unless the territorial statutes were in conflict with article 7 of
the amendments to the federal constitution which provides that " in

suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," which was the only restriction upon the power of the territorial legislature to take away the right of jury trial.    Section 4, art. 1, of the constitution of the state, is that "the right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy."    Section 2, art. 6, of the same instrument, provides that "it [the supreme court] shall have original jurisdiction in such remedial cases as may be prescribed by law, and appellate jurisdiction in all cases, both in law and equity, but there shall be no trial by jury in said court."    The first of these provisions received a construction (always since followed) at an early day in *Whallon* v. *Bancroft,* 4 Minn. 70, (109,) in which it was held that the effect of it was—*First,* to recognize the right of trial by jury as it existed in the territory of Minnesota at the time of the adoption of the constitution; and, *second,* to continue such right unimpaired and inviolate; that it neither took from nor added to the right as it previously existed, the only change being to secure this right in "cases at law" involving less than $20.    *Ames* v. *Lake Superior & Miss. R. Co.,* 21 Minn. 241, 291; *State* v. *City of Lake City,* 25 Minn. 404.    The expression "cases at law" has been invariably construed by this court as referring to ordinary common-law actions, as distinguished from suits in equity or admiralty, and special proceedings, or what are called "remedial cases" in section 2, art. 6.    Whatever may be the scope of the phrase, "suits at common law," in the constitution of the United States as construed by the federal courts, it is certain that the term "cases at law," used in our constitution, as construed by this court, would not include proceedings upon information in the nature of *quo warranto;* also that such proceedings fall within the term "remedial cases," as used in section 2, art. 6.    In *State* v. *City of Lake City, supra,* it is said that a distinction is clearly made between the classes of cases denominated "cases at law" in section 4, art. 1, and those included under the designation of "remedial cases" in section 2, art. 6; the former evidently referring to ordinary common-law actions, while the latter embrace those remedies of a special or extraordinary character, usually spoken of as special proceedings, such as *mandamus, quo*

*warranto,* and others of like special or extraordinary character.   The same distinction and substantially the same definition of "remedial cases" is repeated in *State* v. *St. Paul & Sioux City R. Co., supra,* and as was said in· *State* v. *City of Lake City, supra,* section 4, art. 1, of the constitution, must be construed in connection with section 2; art. 6, which gives this court original jurisdiction in such "remedial cases" as may be prescribed by law, coupled with the express prohibition that there shall be no jury trial in this court.   Evidently the "cases at law" referred to in the first cannot include any of the "remedial cases" included in the second, and the prohibition of a jury trial in this court negatives any implication that the right to such a mode of trial can be enjoyed in any of the "remedial cases" which this court may be authorized to try in the exercise of its original jurisdiction.

. It must therefore be considered as settled that the "remedial cases" of which the legislature may give this court original jurisdiction include all those special or extraordinary proceedings under what are usually called original remedial writs, such as *habeas corpus, mandamus,* prohibition, *quo warranto,* and the like, of which the constitutions of most states, for manifest reasons of public policy and convenience, give original jurisdiction to their highest appellate court; and that none of these special or extraordinary proceedings, under any of these writs, are included within those cases denominated "cases at law" in section 4, art. 1.   This view is right in the line of all the decisions of this court from the earliest date, holding that the right of trial by jury in civil cases under the constitution does not extend to special proceedings, but is limited to the trial of issues of fact in ordinary common-law actions for the recovery of money only, or of specific real and personal property, and actions for divorce for adultery.   *Whallon* v. *Bancroft, supra; Ford* v. *Wright,* 13 Minn. 480, (518;) *State* v. *Sherwood,* 15 ·Minn. 172, (221;) *Finch* v. *Green,* 16 Minn. 315, (355;) *Ames* v. *Lake Superior & Miss. R. Co., supra; Commissioners of Mille Lacs Co.* v. *Morrison,* 22 Minn. 178; *Bruggerman* v. *True,* 25 Minn. 123; *State* v. *City of Lake City, supra; Sumner* v. *Jones,* 27 Minn. 312, (7 N. W. Rep. 265;) *Wendell*

v. *Lebon*, 30 Minn. 234, (15 N. W. Rep. 109;) *Judd* v. *Dike*, 30 Minn. 380, (15 N. W. Rep. 672.)

2. This brings us to the consideration of the merits of the case, which comes up on demurrer to the answer to the information. Both the information and the answer, especially the latter, are so voluminous, going over so much ground, often without regard to the order of time, and so involved in the method of statement, that it becomes somewhat difficult to extract from the whole mass anything like an intelligible and connected statement of facts. The following will perhaps be sufficiently full and accurate for present purposes: The corporation of Seymour, Sabin & Co., organized under Gen. St. 1878, c. 34, title 2, had been engaged for some years in the business of manufacturing, lumbering, and merchandising. In May, 1882, the Northwestern Manufacturing & Car Company was organized as a manufacturing corporation, under Laws 1873, c. 11, (Gen. St. 1878, c. 34, §§ 120–143,) with a professed paid-up capital stock of about $4,500,000, viz., about $3,000,000 preferred stock, and $1,500,000 common stock. It was organized with a view of buying out and continuing the manufacturing business of Seymour, Sabin & Co. Upon its organization it purchased the manufacturing plant and the assets of that company, of the alleged value of $2,617,000, including over $1,250,000 of bills receivable, commonly known as "machine notes," and a large amount of "undivided profits" and "contracts," whatever that may mean. For these assets the car company issued and paid to Seymour, Sabin & Co. $2,617,000 of its preferred stock, and $1,500,000 of its common stock, the latter as "bonus." The car company thereupon engaged in the manufacturing business, while Seymour, Sabin & Co. continued the business of lumbering and merchandising. The latter proceeded to divide up among its own stockholders the stock of the car company, thus received, in exchange for its own stock, which was delivered up and cancelled, on the basis of two dollars of the former for one of the latter. The two companies continued in business about two years, during which they seem to have been in the habit of indorsing each other's paper for large amounts; at least, the car company indorsed that of Seymour, Sabin & Co. to the amount of $500,000, which was outstanding when both

companies failed.   During these two years the car company paid $360,000 in dividends to its preferred stockholders, no part of which, as respondent alleges, was ever earned.

In May, 1884, both companies being insolvent, their affairs were put into the hands of receivers,—the debts of Seymour, Sabin & Co. being over $2,000,000, and its assets realizing at receiver's sale only $45,000, or about two cents on the dollar of its indebtedness; and the debts of the car company being about $3,400,000, and its assets, which were of a very miscellaneous character, estimated at $4,372,000, but realizing at receiver's sale, two years afterwards, only $1,150,-000, which, after deducting expenses and several hundred thousand dollars liabilities contracted by the receiver, left only about $225,-000, or from 10 to 15 cents on the dollar, for the creditors, and nothing, of course, for the stockholders.   In November, 1884, some of the stockholders and creditors of the car company, with a view of saving something out of the wreck, organized the respondent, the Minnesota Thresher Manufacturing Company, with an authorized capital of $7,000,000, viz., $4,000,000 preferred stock, and $3,000,-000 common stock, on the following plan, to wit:  paid-up preferred stock to be issued in exchange for claims against the car company at par, and paid-up common stock in exchange for preferred stock of the car company, dollar for dollar.   All of the stock of respondent has been issued on this plan; and included in the claims against the car company, for which respondent's stock has been thus issued, are the indorsements of the car company upon the paper of Seymour, Sabin & Co., already referred to.   The respondent has thus issued about $1,700,000 of its preferred stock, and $2,000,000 of its common stock, and thus become the owner of claims against the car company to the former amount, and of its stock to the latter amount. Down to April, 1887, the respondent alleges that it supposed that the assets of the car company would realize enough to pay its debts in full, and leave some surplus for its preferred stockholders; but since that date the respondent seems to have continued to issue its stock on the same basis or plan as before, except that those who exchange their preferred stock in the car company for the common stock of respondent are required to place the latter in the hands of certain

trustees, to hold and vote for the term of five years. Common and preferred stock have the same voting power.

In 1887 the court ordered the receiver to sell *en masse* the entire assets of the car company, consisting of stock on hand, accounts, bills receivable to the amount of over $1,500,000, claims against Seymour, Sabin & Co. to a large amount, and some stock in two other insolvent corporations. The respondent purchased the whole of these assets for $1,150,000, and, in order to raise the amount of cash necessary to be paid on the purchase, ($500,000,) devised a scheme by which it executed a mortgage or trust deed for $1,600,000 on the entire property purchased, under which it issued and sold its bonds to the amount of $1,173,000 to its preferred stockholders for 50 cents on the dollar, cash; they at the same time surrendering for cancellation and retirement one dollar of their stock for every two dollars of bonds purchased. After obtaining possession of the property thus purchased at the receiver's sale, which it alleges was worth more than double what it paid for it, the respondent engaged in the manufacturing of machinery at Stillwater, which it is still carrying on quite extensively, having, as it alleges, sold articles of its own manufacture since it commenced business of the value of $1,100,000. As purchaser and owner of the large claims already referred to against Seymour, Sabin & Co. and the car company, the respondent has commenced, or is about to commence, the following suits: *First*, against the stockholders of Seymour, Sabin & Co. who exchanged their stock for that of the car company, it being claimed that such exchange was illegal and in fraud of creditors; *second*, against the holders of the common stock of the car company, on the ground that they have never paid for the same; *third*, against the preferred stockholders of the car company, to recover back the dividends received by them, on the ground that they were never earned.

The articles of association of respondent (Ex. F) state that the organization is formed "pursuant to, and in conformity with, an act of the legislature of the state of Minnesota entitled 'An act relating to manufacturing corporations,' approved March 7, 1873, and the several acts of the legislature amendatory thereof." Laws 1873, *c.* 11; Gen. St. 1878, *c.* 34, §§ 120–143. The articles state that "the ob-

jects for which the association is formed are *the purchase of the capital stock, evidences of indebtedness issued by it, and the assets of the Northwestern Manufacturing & Car Company, a corporation existing under the laws of the state of Minnesota, or any portion of said capital stock, evidence of indebtedness, or assets,* and the manufacture and sale of steam-engines of all kinds, farm implements and machinery of all kinds, and the manufacture and sale of all articles, implements, and machinery of which wood and iron, or either of them, form the principal component parts, and the manufacture of the materials therein used." These articles contain everything required by title 2, chapter 34, except a statement of the highest amount of indebtedness to which the corporation should at any time be subject. The articles were also published and filed as required by that title. The directors also prepared a certificate in the form required by section 9 of the act of 1873, (Gen. St. 1878, *c.* 34, § 128,) in case of manufacturing corporations, but (as we construe the allegations of the answer) it was never filed.

Much of this history is perhaps irrelevant to any questions involved in these proceedings, but it will serve to convey a tolerably clear idea of the situation of things as presented by the record. The relator by his information stands admitting the corporate existence of the respondent, but claims upon the facts four grounds of forfeiture of its franchises for misuser, viz.: *First,* doing business without filing a certificate, as required by section 9 of the act of 1873; *second,* dealing in negotiable paper, and in the stock and indebtedness of other and insolvent corporations, and issuing its stock therefor; *third,* purchasing and retiring its own stock, to the prejudice of its creditors and stockholders; *fourth,* using its franchises and powers as an instrumentality of fraud and oppression, in bringing a large number of suits against the stockholders of Seymour, Sabin & Co. and the car company upon the claims referred to. This last is but a make-weight, and is not urged upon the argument. Taken by itself, there is nothing in it, for, if respondent had the power to purchase these claims, it had an undoubted right to bring suits on them to test the question of the personal liability of the stockholders of these defunct corporations.

The determination of the case will require the consideration of two leading questions: *First*, what kind of a corporation is the respondent? and, *second*, what is the office of an information in the nature of *quo warranto*, and what will constitute a misuser of corporate franchises such as to warrant a judgment of ouster in such proceedings?

The articles of association state that the corporation was formed under the act of 1873 relating to manufacturing corporations, but this does not make it so. To determine its actual character, we must look to the objects of its formation, and the nature of its business, as stated in the articles themselves. It cannot be made one kind of corporation merely by labelling it such, if its declared objects and purposes show it to be something else. No corporation can be organized under the act of 1873, except for an exclusively manufacturing or mechanical business. It does not authorize the organization of a corporation for the purpose of carrying on a manufacturing business, and also another and independent business not properly incident to or connected with manufacturing. This is clear from the very language of the act itself, as well as from the history of the causes leading to its enactment. It was passed immediately after the adoption of the constitutional amendment of 1872, excepting the stockholders of manufacturing and mechanical corporations from the personal liability imposed by article 10, § 3, of the constitution upon the stockholders of all corporations, and was doubtless passed to carry into effect the purpose of that amendment. That purpose was to encourage manufacturing enterprises by exempting those investing their capital in that business from personal liability. One other consideration that not improbably induced this exemption in favor of stockholders in purely manufacturing corporations was that ordinarily the added security to creditors of the personal liability of stockholders is less needed in the case of such corporations, inasmuch as manufacturing is the process of adding value to raw material by labor, and hence, if honestly conducted, is a safer business, and less liable to speculative risks, than trade generally. But to extend the exemption to corporations combining manufacturing with some other distinct and independent business would at once defeat the object of

the amendment of 1872, and also nullify the constitutional provision imposing a personal liability on the stockholders of all but manufacturing corporations; for this exemption could then be secured by attaching a very small manufacturing annex to a very large trading or speculating business, all the risks of the latter being immediately added to the whole business, and no inducement existing to invest any capital in the former, except the smallest possible amount necessary to bring the whole business within the constitutional exemption. It is clear, therefore, to our minds that, under the act of 1873, a corporation can only be organized for carrying on an exclusively manufacturing or mechanical business, which, of course, includes anything that is properly incidental to or necessarily connected with such business. A corporation organized to carry on manufacturing and also some other lawful, but independent, business, belongs to the class authorized by title 2, chapter 34, (sections 109–119.)

With this construction of the law in mind, it is not difficult, on examination of respondent's articles of association, to determine to what class it belongs. One of the declared objects of its formation is to purchase the capital stock and evidences of indebtedness of the car company, a business in no way incident to or properly connected with that of manufacturing. The contention of counsel to the contrary cannot be seriously entertained for a moment. If a manufacturing corporation desires to buy the plant of another corporation formerly engaged in the same business, that is legitimate; and if, in order to get it, it becomes necessary to buy with it some other property, not needed for nor connected with the manufacturing business, this also would be permissible, if done as incidental to the main purpose of securing the plant; but no such reason or excuse existed for buying the stock and indebtedness of the car company. Indeed, it would be difficult to imagine anything more foreign to or inconsistent with a legitimate manufacturing business than for a corporation to invest all its capital in the stock and indebtedness of another and insolvent corporation. Under title 2, a corporation can be organized to carry on any lawful business, and, if parties desire to deal in such speculative property, they can do so under that title, but not under the act of 1873, even by connecting it with manufacturing. Our

conclusion, therefore, is that respondent is a corporation of the class authorized by title 2. That is what the corporators themselves have characterized it by their statement of the objects of its formation. The articles of association were informal or defective in the one particular already mentioned, but we think this was cured by chapter 132, Laws 1887. But, in any event, respondent is a corporation either *de jure* or *de facto*, and it is immaterial here which; for, as already suggested, the relator is not in a position to question its corporate existence.

These views as to the corporate character of respondent dispose of relator's first ground for forfeiture, and in part, at least, of the second; for in the case of a corporation organized under title 2, no certificate, such as is described in Gen. St. 1878, *c.* 34, § 128, is required, and such a corporation may purchase the stock and indebtedness of another corporation if within the objects expressed in its articles of association. Therefore there only remains to be considered the effect —*First*, of respondent's issuing its stock dollar for dollar for the stock and indebtedness of the car company, which was confessedly worth much less than par; and, *second*, of purchasing and retiring its own stock held by those who took its bonds.

While it is not necessary here to go at length into the subject, yet it is proper in this connection to consider briefly the second principal question referred to at the outset, viz., the office of an information in the nature of *quo warranto*, and what will amount to such a misuser of corporate franchises as to justify a judgment of forfeiture in such proceedings. And right here it is important to keep in mind certain distinctions which it seems to us counsel for relator have overlooked. And, first, these special proceedings upon information must not be confounded with a civil action, under Gen. St. 1878, *c.* 79. Although, in a general sense, the two may be termed "concurrent remedies," yet it is undoubtedly true that the office or function of the latter has been enlarged somewhat beyond that of a common-law *quo warranto* information. In some jurisdictions, as formerly with us, the civil action is the only remedy. But while, *quo warranto* having been revived in this state, we have now the two remedies, yet the office of the writ of *quo warranto* ought not to be extended beyond.

what it was at common law. The remedy by civil action is more in accordance with the ordinary mode of judicial procedure in determining property rights, and ought to be pursued except in those special or exceptional cases where the public interests seem to demand a more speedy or summary mode of procedure than by action in the district court. The common-law *quo warranto* information, as we have it to-day, is substantially as left by the changes and modifications made by the statute of 9 Anne, *c.* 20. The scope of the remedy furnished by it is to forfeit the *franchises* of a corporation for misuser or non-user. It is therefore necessary, in order to secure a judicial forfeiture of respondent's charter, to show a misuser of its franchises justifying such a forfeiture; and, as already remarked, the object being to protect the public, and not to redress private grievances, the misuser must be such as to work or threaten a substantial injury to the public, or such as to amount to a violation of the fundamental condition of the contract by which the franchise was granted, and thus defeat the purpose of the grant; and ordinarily the wrong or evil must be one remediable in no other form of judicial proceeding.

Courts always proceed with great caution in declaring a forfeiture of franchises, and require the prosecutor seeking the forfeiture to bring the case clearly within the rules of law entitling him to exact so severe a penalty. It is also necessary to notice the distinction, frequently overlooked, between *franchises* and *powers.* The definition of a "franchise" given by Finch, adopted by Blackstone, and accepted by every authority since, is "a royal privilege or branch of the King's prerogative, subsisting in the hands of a subject." To be a franchise, the right possessed must be such as cannot be exercised without the express permission of the sovereign power,—a privilege or immunity of a public nature which cannot be legally exercised without legislative grant. It follows that the right, whether existing in a natural or artificial person, to carry on any particular business, is not necessarily or usually a franchise. The kinds of business which corporations organized either under title 2, *c.* 34, or under the act of 1873, are authorized to carry on are powers, but not *franchises,* because it is a right possessed by all citizens who choose to engage in it without any legislative grant. The only franchise which such corpo-

v.40m.—15

rations possess is the general franchise to be or exist as a corporate entity. Hence, if they engage in any business not authorized by the statute, it is *ultra vires,* or in excess of their powers, but not a usurpation of franchises not granted, nor necessarily a misuser of those granted. Acts in excess of power may undoubtedly be carried so far as to amount to a misuser of the franchise to be a corporation and a ground for its forfeiture. How far it must go to amount to this the courts have wisely never attempted to define, except in very general terms, preferring the safer course of adopting a gradual process of judicial inclusion and exclusion as the cases arise. But we think it may be safely stated as the general *consensus* of the authorities that, to constitute a misuser of the corporate franchise, such as to warrant its forfeiture, the *ultra vires* acts must be so substantial and continued as to amount to a clear violation of the condition upon which the franchise was granted, and so derange or destroy the business of the corporation that it no longer fulfils the end for which it was created. But, in case of excess of powers, it is only where some public mischief is done or threatened that the state, by the attorney general, should interfere. If, as between the company and its stockholders, there is a wrongful application of the capital, or an illegal incurring of liabilities, it is for the stockholders to complain. If the company is entering into contracts *ultra vires,* to the prejudice of persons outside the corporation, such as creditors, it is for such persons to take steps to protect their interests. The mere fact that acts are *ultra vires* is not necessarily a ground for interference by the state, especially by *quo warranto* to forfeit the corporate franchises. It should also be borne in mind that acts *ultra vires* may justify interference on part of the state by injunction to prohibit a continuance of the excess of powers, which would not be sufficient ground for a forfeiture in proceedings in *quo warranto,* and hence many of the numerous authorities cited by relator, being of that class, are not entirely in point here.

Applying these principles to the facts of this case, we think the state has failed to make out a case entitling it to judgment against respondent. Taking up, first, the issuing of its stock for the stock and indebtedness of the car company: None of the stockholders have any right to complain of this. They are all in the same boat.

They got up the company for that express purpose and on that exact plan. A corporation may take property in payment of its stock, if it be done *bona fide*, and with no sinister or fraudulent purpose, and *there be nothing in its charter or the nature of its business that forbids it.* If this stock and indebtedness of the car company was taken in payment of respondent's stock with a fraudulent purpose, at fictitious values, in case the corporation becomes insolvent, creditors have their remedy against the stockholders as personally liable for stock not paid for. The alleged unlawful purchase and retirement of part of its own stock by the respondent stands on the same footing. If it is a wrong to other stockholders, they have a perfect remedy; and, so far as creditors are concerned, if the act is illegal, the parties who surrendered the stock would still be personally responsible as stockholders in case of the insolvency of the corporation. It may be that the plan on which this corporation is organized is not in accordance with the most approved financial principles, but with these financial matters we have nothing to do, except so far as they may affect the legal questions involved; and, upon the whole facts of the case, we do not think that, under the rules of law applicable, the state has made out a case entitling it to a judgment of forfeiture in these proceedings. It is also a consideration not without weight (although we do not place our decision upon it) that the consequences of whatever mistakes or unauthorized acts may have been made or done by respondent could not now be remedied by any such judgment. In view of the present condition of respondent's business, a dissolution of the corporation, and a forced winding up of its affairs, would involve new and additional loss to all parties concerned, both stockholders and creditors. The demurrer to the answer is therefore overruled, and the information dismissed.