CLARENCE A. SOUTHERLAND, Attorney General of the State of Delaware, upon the relation of WILLIAM H. SNIDER and SYDNEY D. WENTWORTH,

*vs.*

DECIMO CLUB, INC., a corporation of the State of Delaware.

*Kent, July 9, 1928.*

*Aaron Finger* and *David W. Kahn*, of New York City, for relators.

*Josiah Marvel* and *James R. Morford*, of the firm of Marvel, Layton & Morford, for defendant.

THE CHANCELLOR. Upon the question of whether or not the so-called plan is effective and in operation, there is a dispute.

The circumstance to which the defendant's witnesses point as showing that the plan is not in operation is this, namely, that certain assets have not been transferred by the club to the trust as contemplated by the plan, and therefore the latter is not yet effective. To this it is to be said that the transfer of the assets referred to does not appear to be made a *sine qua non* of the plan's operation. That the trust, notwithstanding the absence of the transfer, is an active and going organization is clear from the evidence. Members joining the club must at the same time subscribe to the terms of the trust, paying the initial sum of $25, or other amount as may be required by the trustees for the uses of the trust; the $5 monthly payment as provided by the club and trust regulations is being collected by the trust from each member of the club; the allocation of monthly payments is being made in accordance with the terms of the declaration of trust; the chapters of the club are being supported by appropriations from the accumulations of the $2 monthly amounts allotted for that purpose and certificates of beneficial membership in the trust have been issued and are being issued as new members of the club join.

It is clear from the evidence that the trust is functioning as a part of the Decimo plan, notwithstanding it may not be in possession of as much in the way of assets as was originally anticipated as possible. The withheld assets are those which were to be conveyed by the club and the only reason why the transfer has not been made is that one of the club's officers has become recalcitrant and refuses, in the face of demands and threats of expulsion by fellow members of the board of governors, to make the transfer. The trust, in spite of this dissension among the club's officials, has however proceeded with its contemplated activities. Decimo Industries, a corporation, has been incorporated and I assume that the Decimo Trust has employed, or will employ, $3 of the $5 received monthly from each of its subscribers (also club members) to the purchase of that corporation's stock as it is obligated to do.

The plan seems, therefore, to be in operation and I am compelled to the view that the Decimo movement with its three features (club, trust and industries) is in full swing, so to speak.

The bill charges that the club was, under the Monjar regime, engaged in business for profit through the Apasco Corporation and the Drew Tailoring Corporation; that when its business activities as conducted by Monjar needed to be discontinued by reason of troubles which the club encountered as incident thereto, the managers of the club engaged in an effort to revive and continue the business theretofore conducted through the Apasco Corporation and the Drew Tailoring Corporation through other corporations which the managers of the club might cause to be organized. The bill does not attempt to specify the method by which the defendant proposed to continue in the business referred to. But the evidence, it is contended, shows that method to be the scheme or plan referred to in the statement of facts, Decimo Industries being the profit earner of the group. I do not deem it necessary to pass upon the question of whether or not the club under Monjar's regime, did in fact operate as a profit-making concern. This, however, may be said, namely, that the evidence adduced except in one particular leaves it doubtful whether the club under the Monjar management did in fact operate as a profit-making concern. The particular referred to consists of an admission made in a letter dated December 27, 1927, and written by the national board of governors of the club per T. M. Phillips, its executive committeeman, to the New York District, No. 1. The language of the letter constituting such admission is as follows:

"We are confronted with a great taxation problem which is, in itself, extremely difficult. As a membership corporation we have been advised that we have no legal right to engage in business undertakings. Yet, under the leadership of Mr. Monjar your club did indirectly engage in business through the Apasco Corporation and the Drew Tailoring Corporation from the former of which enterprise, however, Mr. Monjar and his associates derived the greatest amount of benefit."

It is to be noted that the language of this letter admits in behalf of the national board of governors that the Club had indirectly engaged in business. If its business activities were such as to warrant the view that the corporation was in fact one for profit, the circumstance that its activities were carried on indirectly rather than directly cannot help the situation, for

indirection finds no more favor in equity than does direction. All that the letter admits is the indirect engaging in business. The extent to which business was engaged in is not set forth. Whether it was such as to indicate profits to be one at least of the principal objects of the corporation's existence cannot be inferred from the admission. I take it that a non-profit or membership corporation may be permitted to engage in business to some extent and that the statute does not mean to prohibit absolutely and entirely such corporations from doing business. The statute does not mention the word "business." It speaks only of corporations "not for profit." While profit has its origin ordinarily from business activities, yet it does not follow that a membership corporation which engages in business is necessarily a corporation for profit within the meaning of the act. If the facts and circumstances show the business to be such in character and volume as to indicate that the engaging in business and the making of profits therefrom for the benefit of its members is the principal or one of the principal objects of the corporation, rather than a thing which is subordinate and merely incidental to the principal object of its existence, it is reasonable to conclude that the corporation cannot be called one which is organized "not for profit."

In *Read v. Tidewater Coal Exchange, Inc.*, 13 *Del. Ch.* 195, 116 *A.* 898, the following language was used in reference to the sort of corporations meant to be covered by the phrase "not for profit" as used in the statute we are here concerned with:

"Whether dividends are expected to be paid may, generally speaking, be taken as the test by which we are to determine whether, or not, a given corporation is organized for profit. Perhaps a better way to put it would be to say that a corporation is for profit when its purpose is, whether dividends are intended to be declared or not, to make a profit on the business it does which in reason belongs to it and which if its affairs are administered in good faith would be available for dividends. Subterfuges by which a corporation allowed its profits to be diverted to those owning it, though not in the form of dividends, would manifestly not remove from the corporation its feature of profit making. Nor would a mere declaration in its certificate of incorporation that it was organized not for profit, be sufficient to stamp upon it a non-profit character. In each case, when the corporation is examined, the true facts must be ascertained and the corporation judged accordingly, no matter what its scheme of operation, or its pretensions may be. Such being

true, the state is always protected against schemes to evade franchise taxes, first by the inspection which the corporation must undergo before the Secretary of State, and secondly by the writ of *quo warranto* which the state may always employ to oust a corporation for abuse of its franchise.

"Profit furthermore must be something of a tangible or pecuniary nature. Intangible benefits, not capable of measurement in definite terms, though of value to the recipients, cannot be called profits. When we speak of a corporation for profit, I take it also that we mean profit coming to, or belonging to, the corporation *qua* such, as distinguished from its members or stockholders. Barring cases where profits are improperly diverted directly to the corporate members and not conveyed to them through the channel of the corporate treasury, which cases would rest on a distinct footing, the term 'profit' as employed in the section under discussion means gain or earnings that are expected to come into the possession of the corporation."

The admission referred to in the letter above quoted is not enough to indicate that the corporation under the Monjar management had done acts which would bring it within either the letter or the spirit of the language used in the *Tidewater Coal Exchange Case.* Nor can I find anything in the other evidence in the case which persuades me that the Monjar management had turned the corporation into a profit-making concern. Whether the whole story of the Monjar regime is told by the evidence, I do not of course know. Looking only at the evidence, however, to which the court is of course confined, what Monjar seems to have done was to use his position as the dominant factor in the club for the purpose of making money for himself. When the Monjar control was ousted and the present regime installed in power, the new national board of governors evidently took the view that Monjar's gain had been obtained from moneys belonging to the club members and accordingly made demand upon him to make restitution to the club itself. In so far as Monjar's gains came from the contract with the club by which he took all or part of the club's initiation fees, the demand upon him was entirely consistent with the club's status as a non-profit organization. But in so far as the demand was predicated upon profits which Monjar earned through the business activities of the Apasco and Drew companies, it would seem that the club by making the demand recognized Monjar's business ventures as its own and thereby confessed itself as the true owner in behalf of

all its members of Monjar's purely profit-earning enterprises. This may explain the admission made in the letter before quoted, and if true would seem to impress upon the club the character of a concern one of whose principal objects was the earning of profits.

As a result of the demand upon Monjar for restitution, the club came into ownership of all the stock of the Apasco Corporation which in turn controlled the Drew Tailoring Corporation. It proceeded to liquidate the affairs of these concerns with the view of discontinuing the service which they had under the Monjar regime rendered to the club members. The process of liquidation is still going on. Something has been attempted by the state to be made out of the activities of the club in connection with this liquidation. If the acquisition of Monjar's Apasco stock was unobjectionable, I do not see how the mere liquidation of the assets represented by the stock can be regarded as objectionable, and accordingly nothing is to be predicated on the mere liquidation activities.

A moment ago, it was observed that the evidence, outside of the admission contained in the letter referred to, leaves it doubtful whether the club under Monjar's management did in fact operate as a corporation for profit. The manner of conducting the club and shaping its policy since the termination of that regime is significant as possibly tending by its coloring effect to render less doubtful the character of the Monjar policies; certainly it is of the utmost significance in determining the business policy of the club at the present time and since the present management was installed in power.

Accordingly it is now in order to examine the club and its activities as the same have been and are being managed under the present national board of governors. One thing would seem to me to stand out clearly and that is that whether or not the Monjar plan of operation constituted in fact a doing of business by the club for profit, the new board of governors saw the money-making possibilities which lay in the fundamental idea at the root of Monjar's operation. They saw, in other words, the fruitful possibilities to be realized by a joint appeal to the fraternal and social instincts of men on the one hand and to their desire for gain on the other. Monjar had demonstrated the ease with

which business could be done with a group of men behind him who were welded together in the name of fraternity and brotherhood and who as a group could be exploited with the offer of opportunities of either making or saving money. Men organized on the basis of an appeal to the instincts of brotherhood were shown to be capable of a cohesive welding by the opportunity for business gain.

That the new national board of governors saw this and addressed themselves to the problem of retaining the essence of Monjar's idea while abandoning its supposedly objectionable illegality, is a fact which stands out clearly from the evidence. And so they devised and placed in operation the present plan known as the Decimo plan or movement. By this plan, it was evidently thought that the fraternal and social phases of the Decimo movement were kept completely segregated from its profit-making phases. The former are thought to be provided for by the Decimo Club, Inc., the defendant in this cause, a non-profit organization; the latter by the Decimo Industries, a profit-making corporation. The Decimo Trust is the link which connects the two. No one can be a member of the club unless he subscribes to and becomes a certificate holder in the trust. No dues or initiation fees are paid to the club by its members. All payments of initiation fees and monthly sums go to the trust, and the club chapters are dependent upon the discretionary bounty of the trust for moneys necessary for their proper functioning. The trustees must be club members and are chosen from nominees named by the certificate holders (club members). The $5 monthly payments made by each member go to the trust and are allocated—$2 for club purposes and $3 for investment in stock of Decimo Industries. It is in connection with the use made of the aggregate of the monthly sums of $3 that the state insists the element of profit-making is made out against the defendant. If the club reaches its projected maximum membership of 100,000, these monthly payments will yield $3,600,000 per annum available for investment in Decimo Industries, a corporation designed for a variety of investment and industrial purposes. During the life of the trust (which must terminate in not longer than fifty years, or may be ended at any time by vote

of a majority of its certificate holders who are all club members), the dividends from the trust's investments in Decimo Industries' stock are, when distributed by the trustees, to go to the certificate holders. If this were the end of the. story, it is very doubtful if anything of an illegal .nature could be charged against the club as a non-profit organization, because so far as yet appears the club as such derives no benefit from the business which its members in another role as certificate holders hope to profit from.

But this is not the end of the story. A most important and significant provision (*Section* 56) in the declaration of trust is this, that upon the termination of the trust, its property and assets belong, not to its certificate holders, but to the club, this defendant. How this provision can indicate anything other than that the club is in reality the owner of the investments made by the trust, it is impossible to see. If the trust, while it is functioning, should choose not to declare dividends to its certificate holders, but to allow all its earnings from the Decimo Industries investment to accumulate, it is manifest that in the end the club itself as an entity distinct from its members would upon termination of the trust own not only the principal of the investment made by the trustees, but as well all profits obtained therefrom. In that event the club would disburse, or would have available for disbursement, the earnings to its, or for the benefit of its, members *qua* such. If no such cumulation of profits by the trust were allowed, the same would be disbursed to the same class, viz. club members, not to be sure *qua* such, but as certificate holders. The situation therefore is one where money is being collected from club members to be invested for profit-making purposes. The investment constitutes as to its corpus a trust estate for the club and the earnings from the corpus go either to the club members direct, who temporarily are called certificate holders, or eventually to the club. Looking through the technical aspects of the scheme, it appears in substance to be the same as though the club itself took three dollars a month from each of its members for the purpose of embarking upon profit-making enterprises, passed on to or for the benefit of its members such portions of the profits earned as its governing officials might from time to time determine and eventually holding or distributing

the corpus of the investment together with all accumulated earnings as future policy might suggest.

To be sure a corporation in legal contemplation possesses a distinct entity of its own. Yet in a very substantial sense it may be thought of as a creature made up of its membership. It exists for them and holds all its franchises, property and assets in trust for them. Its capital is theirs and its profits are theirs to be passed on to them for individual use or held and employed for their benefit. The designers of the plan here under review have succeeded in holding intact for the defendant corporation all the moneys or their equivalent collected from the club membership for the ultimate ownership of the club and, for an interval of time, indirectly assuring to the membership the profits earned, after which interval the membership shall look directly to the club entity for their direct or indirect participation in the investment and the profits. The defendant seeks to obviate the effect of *Section* 56 of the declaration of trust as pointing to the club as the true owner of the business by arguing that the title to the assets which must ultimately vest in the club is a title not in its own right, but one simply in trust for the certificate holders. This argument is without force for two reasons. In the first and most important place, it finds no support in the language of the section itself by which the devolution of title is provided for. In the second place, any trust that might be inferred can be nothing more than the usual *quasi* trust by which corporations of every kind hold the corporate assets, that is for the benefit of its membership. In this case the club membership is synonymous with the body of certificate holders, and in reality therefore there can be no trust aspect in the situation which divorces the corporation itself from that absolute ownership by which all corporate creatures hold their assets.

The whole scheme appears to be a subterfuge by which the defendant, incorporated as a no-profit concern, seeks to accomplish as one of its chief purposes the end of earning pecuniary profits for its members, keeping control all the time over the operations of the venture and ultimately merging in plain view as the absolute owner of the profit-seeking enterprise. So far as I am advised clubs of a social and like nature do not make pro-

vision for the saving to retiring members or to the estates of deceased members of an equitable portion of the corporate assets in hand when the connection is terminated. This emphasizes the purely non-profit character of such organizations. In the instant case however the purely business aspect of this club's character is recognized by the detailed provision touching the redemption value of each member's equity in the assets of the trust (ultimately of the club), for upon the cessation of club membership, rights in the trust estate are terminated and the cash value of the member's beneficial interest in the trust estate is paid to him. Furthermore, no new member can come in until he has paid an initial sum equivalent to the then cash value of a member's equitable share in the assets. These provisions are thoroughly consistent with the conception that the club, whatever else it may be interested in, regards itself as handling a business enterprise in which the rights of its respective members in the assets and profits of the venture ought in all fairness to be brought to an even equitable basis.

The purposes of the club as set forth in its certificate are such as to show it to be a corporation not for profit. The evidence shows, too, that it engages in certain activities of a non-profit nature, such as work of a social, welfare and general cultural nature. But the facts show also that in practice, one of its chief purposes is to engage in business for profit to its members, said business being segregated in a trust for a limited period and at the end of the period to be turned over to itself as the legal owner. This money-making purpose is not a merely incidental and collateral one. If it were, a different case would call for consideration. The purpose to make profits directly or indirectly for its members appears to be not the only important purpose, but certainly an important purpose; so much so that it is difficult to say which outranks the other—the purpose to advance the social and cultural welfare of its members, or the purpose to make money for them. From the evidence, it would seem that from its organization to date the appeal has been more to the instinct of men for profit than to the instincts for social and fraternal development.

It is doubtless true that a social organization may be in-

corporated under the non-profit provision of our statute and within reasonable and proper limits engage in an activity to make profit. How far such an organization can go in that direction it is impossible to say in general terms. Each case, as observed in *Read v. Tidewater Coal Exchange, Inc.*, *supra*, must stand on its own facts. Where, however, a non-profit corporation shows by its conduct that profit-making is one of its most important purposes, if not its chief one, I can see no escape from the conclusion that it has misused and abused its franchise. If its sponsors desire to resort to the act of this state for its incorporation, resort may be had to the provisions appropriate for that form of organization.

It was not the intention of the Legislature to allow the easy and liberal provisions of the corporation and revenue statutes applicable to corporations organized not for profit to be enjoyed by corporations whose purpose is in fact to engage in business for profit to such an extent that the desire for profits constitutes a conspicuous object of its existence.

Solicitors for the defendant make the point that courts are reluctant to pronounce a sentence of death upon a corporation for abuse of franchise. In this connection they cite: *People v. North River Sugar Refining Co.*, 121 *N. Y.* 582, 24 *N. E.* 834, 9 *L. R. A.* 39, 18 *Am. St. Rep.* 843; *State ex rel. Clapp v. Minnesota Thresher Mfg. Co.*, 40 *Minn.* 213, 41 *N. W.* 1020, 3 *L. R. A.* 518; *Thompson on Corporations*, §§ 6478, 6479; 7 *Ruling Case Law*, § 715, *p.* 710; and 14 *C. J.* 1107. Where, however, there is a clear case of abuse of corporate privileges and franchises as in *People ex rel. v. Michigan Sanitarium & Benevolent Ass'n*, 151 *Mich.* 452, 115 *N. W.* 423, courts will not hesitate to pass the sentence. I cannot escape the conclusion that the evidence in this case shows the defendant, organized as a non-profit corporation, to be now engaged in misusing and abusing its corporate powers, privileges and franchises by seeking as one of the principal objects of its existence to make profits for the use of itself and members. Such being the conclusion a decree of revocation and forfeiture as authorized by the statute must be entered.

Decree accordingly.