MARCUS LAURITSEN v. VIRGIL B. SEWARD.[1]

November 2, 1906.

Nos. 15,065—(197).

**Jurisdiction of Supreme Court.**

R. L. 1905, § 203, in so far as it attempts to confer upon the supreme court original jurisdiction in election contests, is unconstitutional.

**Supreme Court—Remedial Cases.**

The "remedial cases" in which the legislature is authorized to confer original jurisdiction upon the supreme court include only those cases in which the remedy is afforded summarily through certain extraordinary writs, such as mandamus, quo warranto, and habeas corpus.

**Jurisdiction of Courts—Writs.**

When jurisdiction in certain cases which are remediable through extraordinary writs which have a recognized technical use is conferred upon a court by the constitution, the jurisdiction is limited to the cases which

[1] Reported in 109 N. W. 404.

were determinable through such writs at the time of the adoption of the constitution.

**Writ of Mandamus.**

Before the time when the constitution of Minnesota was adopted, the writ of mandamus had lost its original character of a prerogative writ which created the duty, the performance of which it commanded, and had become a judicial writ in prerogative form for the enforcement of clearly defined existing legal rights for the protection of which no other adequate remedy existed. It is for this purpose only that the supreme court can be empowered to grant the writ of mandamus.

**Same—Election Contest.**

An election contest, which involves charges of fraud, illegal voting, and the legality of the election, cannot be determined in mandamus proceedings.

**R. L. 1905, §§ 202, 203.**

R. L. 1905, § 202, provides for a procedure which is, in substance, mandamus, and the purposes there sought to be effected are within the scope of the common-law use of that writ. Original jurisdiction in such instances may therefore be conferred upon the supreme court. But section 203 provides for an election contest which must first be determined by the district court.

In the matter of the election contest between Marcus Lauritsen and Virgil B. Seward for the nomination of senator. Proceedings dismissed.

Upon the presentation of the affidavit of Marcus Lauritsen to one of the justices of the supreme court, an order issued requiring Virgil B. Seward and other persons named therein to show cause at a time stated why the relief prayed for in the affidavit should not be granted. Upon the return to the order the parties to whom it was directed moved to dismiss the proceedings, on the ground that the supreme court has no jurisdiction to entertain the proceedings and grant the relief prayed for.

The affiant alleges his residence in the village of Tyler, in Lincoln county, Minnesota and that he is a qualified voter and member of the Republican party. That the counties of Lincoln, Lyon, and Yellow Medicine constitute, and during the times mentioned have constituted, the Seventeenth legislative district of Minnesota; that said district consists of seventy seven election districts or precincts, of which twenty

are in the county of Lincoln, thirty in the county of Lyon, and twenty seven in the county of Yellow Medicine. That in the month of July, 1906, the affiant filed with the secretary of state his affidavit in due form of law, declaring his desire to be a candidate for the nomination by the Republican party for the office of senator in the legislature of the said state from said Seventeenth district, and paid the proper fee therefor. That subsequently Virgil B. Seward, Ole Ostensoe, and Robert Faulds in like manner filed as candidates for said office, and the names of the four candidates were duly printed upon the official ballots as candidates for nomination by the Republican party for said office at said primary election. That R. H. Sisson, Thomas McKinley, and S. O. Tjasvold are, and during all the times mentioned were, respectively, the auditors of the said counties hereinbefore mentioned. That the Republican party has maintained in said Seventeenth legislative district a party organization, and presented candidates for election at more than three biennial elections within the past ten years, and cast more than ten per cent. of the total vote cast at the last preceding election in said legislative district for its leading candidates

That on September 18, 1906, there was held at the various precincts in the said legislative district, in pursuance of the statute, a primary election for the purpose, among other things, of choosing a candidate of the Republican party for said office of senator, to be voted for at the general election to be held in said district in November, 1906. That ballots were used, as by law authorized, by certain of the electors of said legislative district at said primary election, and that this affiant, Virgil B. Seward, said Ostensoe, and said Faulds were each voted for for said office of senator at said primary election by certain of the electors voting thereat using said ballots. That the ballots cast, marked, and voted for said candidates at said primary election were thereafter counted by the judges and clerks of election apparently in the manner provided by law, but in fact, as hereinafter stated, in violation of the law, equity, and justice, and in fraud of the affiant and the people of the state of Minnesota. That thereafter the canvassing boards of each of said counties which were charged with the duty of canvassing the primary election returns of said district met and canvassed the returns of said primary election and completed their said canvass. That thereafter the auditor of each of said counties

certified to the secretary of state the vote as shown by the report of said canvassing board of each of said counties for said office of senator, and thereafter the state canvassing board opened and canvassed the returns of said primary elections so made to the secretary of state, and said state canvassing board completed its canvass on October 5, 1906.

That the state canvassing board made a return and certificate, whereby it appears that the total number of votes cast at said election in said legislative district for each of said candidates for said office of senator so appearing upon the said ballots were as follows: This affiant, Marcus Lauritsen, 2,287; Virgil B. Seward, 2,574; Ole Ostensoe, 717; Robert Faulds, 274—total, 5,852; and said Virgil B. Seward was certified by said canvassing board to be the nominee of said Republican party for said office to be voted for at the general election to be held in November, 1906, and the auditors of said several counties were so notified by the secretary of state. That in said several reports of said judges and clerks and said canvassing boards and said auditors it was made to appear that the total number of votes cast in Lincoln county for said Seward was 281, for this affiant, Lauritsen, 933, for said Ostensoe, 79, and for said Faulds, 118; in Lyon county for said Seward was 1,800, for this affiant, Lauritsen, 753, for said Ostensoe, 186, and for said Faulds, 274; and in said Yellow Medicine county for said Seward 493, for this affiant, Lauritsen, 601, for said Ostensoe, 252, and for said Faulds, 53. That at said primary election in each of said precincts or election districts at least five ballots, aggregating at least 385 ballots, which were marked, cast, and voted by voters of said legislative district duly qualified to vote at said primary election for candidates for Republican nomination for this affiant as Republican candidate for said office of senator from said legislative district, were through mistake, inadvertence, or fraud never read or counted by said judges or clerks of any of said election districts or precincts, or by said canvassing boards for said office, and that at said primary election at least five ballots in each of said election districts or precincts, aggregating at least 385 ballots which were duly marked, cast, and voted by duly qualified electors in such election district, were, through mistake, inadvertence, or fraud, wrongfully, unlawfully, and fraudulently read and counted by the clerks

and judges of said primary election in each of said election districts or precincts as having been marked, cast, and voted for said Virgil B. Seward, said Ostensoe, or said Faulds as candidates for nomination by said Republican party for said office of senator at said primary election, and that said five or more ballots in each of said election districts or precincts so read and counted were in truth and fact not so marked, cast, and voted by said electors for said Virgil B. Seward, said Ostensoe, or said Faulds, but that each of said ballots were marked, cast, and voted by said electors for this affiant.

That the village of Marshall, in Lyon county, consists, and consisted at said primary election, of two election precincts or districts, to wit, the Eighteenth precinct, including the First ward of said village, and the Nineteenth, including the Second ward of said village. That the returns and reports of the judges and clerks of said Eighteenth precinct show that there were cast, voted, and counted at said primary election for the Republican nomination for said office of senator 262 votes, of which 29 were for this affiant, 217 for Seward, 6 for Ostensoe, and 10 for Faulds; and the returns and reports for said Nineteenth precinct show that there were cast, voted, and counted for said primary election for the Republican nomination for said office of senator 285 votes, of which 50 were for this affiant, 218 for Seward, 6 for Ostensoe, and 11 for Faulds, and said figures also appear and are included in the reports and the conclusion of the several canvassing boards. That in point of fact not more than 325 votes were cast and voted for the candidates for the Republican nomination for senator in said two precincts by voters qualified to vote at said primary election, and that the balance of the vote marked, voted, cast, and counted in said two precincts, and each of them, were cast by persons who were not qualified to vote thereat at all, in that they were not at the time residents of the said election districts or precincts in which they respectively voted, and never have been. That the election judges and clerks knew at the time said persons not so qualified marked, cast, and voted their ballot, and when said election judges and clerks accepted their ballot so marked and cast, that they were not, and each of them was not, qualified, and that said election judges and clerks knowingly and fraudulently conspired and connived with the friends, agents, supporters, and promoters of said Seward to permit and pro-

cure said persons not so qualified to vote at said primary election, to the end that the vote of said Seward might be increased beyond the number legally cast for him at said election. That whether the said Seward was himself cognizant of the fraudulent methods pursued, and consented thereto and co-operated therein, this affiant is unable to state, but he does state that many of the friends, agents, and supporters of said Seward were cognizant thereof, connected therewith, and co-operated therein. That to fraudulently increase the voters at said primary election, persons under age, or temporarily sojourning in said village or passing through said village, not residents thereof, and known to said judges and clerks and friends and supporters of said Seward not to be, were induced to go to the polling places in said precincts, to register thereat, to take Republican ballots, and urged to vote for said Seward for the nomination for said senator. That such persons, to the number hereinafter stated, did vote at the said primary election, using the Republican ballots. That this affiant had no knowledge of the method so being pursued until long after said election was completed, and has no knowledge as to how said persons so improperly voting actually did vote, except from the fact that their fraudulent conduct was at the instance of the said friends, agents, and supporters of said Seward, and that therefore they and all of them probably voted for said Seward. That said persons have since for the most part disappeared, and their whereabouts cannot be located, and that it is impossible to learn or tell positively for whom they voted, or to ascertain the true lawful vote at said primary election for the Republican nomination for said office of senator.

That had it not been for the aforesaid wrongful and unlawful acts of said clerks and judges of election, due to inadvertence or mistake, as before said, and for the fraudulent and improper conduct of said judges and clerks and said friends, agents, and supporters of said Seward in procuring and accepting the ballots of said persons not so qualified to vote at said primary election, this affiant would have received, and there would have been counted, canvassed, and certified and canvassed for him a higher and greater number of votes than were counted, canvassed, or certified, as aforesaid, for said Virgil B. Seward. That because of said unlawful, wrongful, and fraudulent acts of said judges and clerks of said primary election, whether caused by

inadvertence, mistake, or fraud, this affiant has been and will be deprived of his privilege and right to have his name placed and printed upon the official ballot, to be voted for as a nominee of the Republican party for said office of senator at the ensuing general election, and unless restrained by the order of this court the county auditor of each of said counties will place the name of said Virgil B. Seward upon the official ballot as the Republican nominee for said office, to be voted for at said general election. That this affiant desires and intends to contest the alleged election of said Virgil B. Seward as nominee of said Republican party for said office, as determined and certified by said state canvassing board, and to that end does make this affidavit.

That to make said contest and to properly prosecute the same it is requisite, necessary, and proper that an examination, inspection, and recount of the ballots cast in each of the precincts or election districts in said Seventeenth legislative district should be had and made, and for that purpose that a referee or referees should be appointed by the court, and that the county auditor of each of the said counties should be restrained from placing the name of the said Virgil B. Seward on the official ballot for said office in the election to be held as aforesaid in November, 1906, and that because of the limited time for presenting the evidence in said matter such examination, inspection, and recount should begin with said Lyon county.

Wherefore the affiant prays the order and the leave of the court:

1. That the ballots cast in each of the election districts of the said Seventeenth legislative district of the state of Minnesota at the said primary election may be examined, inspected, and recounted, and to that end a referee or referees be appointed by said court with full power in the premises.

2. That the said Virgil B. Seward be required to appear and abide the order of the court herein, and that a time and place be fixed when evidence may be presented in support of the allegations hereof, and that on such evidence the votes cast in the Eighteenth and Nineteenth precincts of said Lyon county for the Republican nomination for senator be rejected.

3. That the county auditors of each of the said counties be restrained and enjoined from printing or placing the name of the said Virgil B. Seward as a candidate of the Republican party for said nomination

for said office of senator from the said legislative district upon the ballots to be used at the general election to be held in November, 1906, and that each of said county auditors be directed to place and print the name of this affiant upon said ballots for said office to be voted on at the said general election.

4. That this affiant have other and further relief in the premises as may be just.

*Ambrose Tighe,* for contestant. ·
*Thos. E. Davis,* for contestee.

ELLIOTT, J. (after stating the facts as above.)

This is an application made directly to the supreme court under a statute which in express terms confers upon the court original jurisdiction to hear and determine election contests. The petitioner by his allegations has brought himself clearly within the provisions of the statute, and the court has jurisdiction to grant the relief sought, providing the legislature had the power to confer it. R. L. 1905, § 202, provides:

> Review by Courts. Whenever it shall be made to appear by affidavit to any judge of the supreme court, or of the district court of the proper county, that an error or omission has occurred or is about to occur in the placing of any name on the primary election ballot, that any error has been, or is about to be committed in printing such ballot, or that any wrongful act has been or is about to be done by any judge or clerk of a primary election, county auditor, canvassing board, member thereof, or other person charged with any duty concerning the primary election, or that any neglect of duty has occurred, or is about to occur, such judge shall order the officer or person charged with such error, wrong or neglect to forthwith correct the error, desist from the wrongful act, or perform the duty, or forthwith show cause why he should not do so. Failure to obey the order of such judge shall be contempt of court.
>
> Sec. 203. Contests for Nomination. Any candidate at a primary election desiring to contest the nomination of another candidate for the same office may proceed by affidavit within five days after the completion of the canvass, as specified in

section 202; and the contestee shall be required by the order of such judge to appear and abide the further order of the court made therein.

The supreme court of the state is a constitutional appellate court, with original jurisdiction only in the particular instances in which it is expressly conferred by the constitution. Its appellate jurisdiction is general and unrestricted; its original jurisdiction is special, and restricted. The general policy which was embodied by the people in that instrument is apparent upon the slightest consideration. The judicial system created by the constitution rests upon the theory that general original jurisdiction is vested in the district courts, which have succeeded historically to the ancient English court of King's Bench. In these and inferior courts of original jurisdiction all cases are supposed to be heard and determined in the first instance. Over and above these courts is placed an appellate court, charged with the power of supervision, review, and cassation. The organization and constitution of that court is adapted primarily to the work of review only.

But under every system contingencies will arise which call for the peremptory and prompt relief which only a court of final resort can grant. Under the English system, these instances were provided for by the King's prerogative, by means of which relief was granted in cases where the ordinary courts were powerless, and no other adequate remedy was provided. In the course of time this great prerogative power came to be exercised by means of certain remedial writs, issuing in the King's name out of the court in which the King theoretically or in fact was always present. Recognizing the occasional necessity for such extraordinary proceedings, the framers of the constitution provided that the supreme court "shall have original jurisdiction in such remedial cases as may be prescribed by law, and appellate jurisdiction in all cases both in law and equity, but there shall be no trial by jury in said court." Const. art. 6, § 2. The legislature is thus authorized to confer original jurisdiction upon the supreme court in remedial cases, subject to the limitation that there shall be no trial by jury. It can confer original jurisdiction in no other cases.

The word "remedial," as applied to statutes, is commonly given a very extended meaning, and made to include all such as are enacted from time to time to supply the defects of the existing law, whether arising from the inevitable imperfections of human legislation, from change of circumstances, from mistake, or from any other cause. But it is apparent that the word is not used in this connection in the constitution. As said by Chief Justice Gilfillan in State v. St. Paul & S. C. R. Co., 35 Minn. 222, 28 N. W. 245: "It is evident that the term 'remedial cases' has here but a limited signification, and cannot extend to all remedies for wrongs; for a very important part of the machinery to administer such remedies in most cases, to wit, the jury, is withheld from the court. It has been the understanding of the court, as we think, from the beginning, and we think also of the bar, as it evidently has been of the legislature, that the cases intended by the term 'remedial cases' are those where the remedy is afforded summarily through certain extraordinary writs, such as prohibition, mandamus, certiorari and quo warranto. Any greater or less extensive meaning could hardly be given to the term without making it so indefinite as to make it difficult to say what it means. We are satisfied that is the sense in which the term was used in the constitution." In State v. Minnesota Thresher Mnfg. Co., 40 Minn. 213, 217, 41 N. W. 1021, 3 L. R. A. 510, Mr. Justice Mitchell said: "It must therefore be considered as settled that the 'remedial cases' of which the legislature may give this court original jurisdiction include all those special or extraordinary proceedings under what are usually called 'original remedial writs,' such as habeas corpus, mandamus, prohibition, quo warranto, and the like, of which the constitutions of most states, for reasons of public policy and convenience, give original jurisdiction to their highest appellate court."

The contention is that the proceeding which is authorized by the provisions of the Revised Laws above quoted is in substance and effect a mandamus proceeding, and hence within the constitutional grant of original jurisdiction. But the petitioner is seeking the order for a purpose in aid of which mandamus would not issue at common law or under the established practice in this state. The constitution only authorizes the legislature to confer upon the supreme court original jurisdiction in cases in which the remedy by mandamus would have

been · available at common law. It is elementary that words and terms which have a technical and definite meaning must be taken in the sense in which they were understood at the time when they were introduced into the instrument. Manly v. State, 7 Md. 135; Miller v. Dunn, 72 Cal. 462, 14 Pac. 27, 1 Am. St. 67; Attorney General v. Taggart, 66 N. H. 362, 29 Atl. 1027, 25 L. R. A. 613. Thus the trial by jury, which is secured by the constitution of the United States to a citizen who is charged with a crime, is the jury trial as it was known to the common law and as it prevailed when the people adopted the particular constitutional provision. Any attempt of a legislature to deprive a defendant of a jury trial as it was known at the common law, by the substitution of a trial by a differently constituted tribunal, although called a jury, is ineffectual. State v. Everett, 14 Minn. 330 (439); State v. Minn. Thresher Mnfg. Co., 40 Minn. 213, 216, 41 N. W. 1021, 3 L. R. A. 510; Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061; Opinion of the Justices, 41 N. H. 550.

Upon the same principle of construction we must hold that the legislature has no constitutional power to require this court to exercise original jurisdiction through mandamus proceedings in cases in which mandamus was not the proper remedy at common law as understood and determined when the constitution was adopted. It was at that time thoroughly settled that mandamus was not a creative remedy. It did not call into existence any new liability or duty, and never commanded the performance of an act which was unauthorized in the absence of the writ.

The origin of this ancient writ is very obscure. It has undergone many changes during the generations in which it has been in use. It was originally a high prerogative writ, and the King's prerogative was part of the common law of England. It was the aggregate of the King's special powers and privileges—what Bracton calls privilegia regis, and Briton le droit le roy—the personal rights or powers of supreme character exercisable without question and without responsibility. 10 Enc. of Laws of England, 311. In the beginning the King doubtless sent his signet ring to attest the authority of his verbal message of command. The earliest writs were in the form of letters missive, and were mere personal commands. They were writs of direction, created and enforced by authority of the royal will—vobis

mandamus. The command was a law in itself, from which · there was no appeal. It was not only declaratory of a duty under an existing law, but was a law in itself. It created the law and imposed the duty, the performance of which it commanded. In time there came into use a judicial writ of mandamus, which issued in the King's name out of the court of King's Bench, and which gradually supplanted the old personal command of the sovereign. By the end of the reign of Edward I this form of mandamus was in common use in aid of the police power of the kingdom. Its proper use was settled in England long prior to the time when the common law passed to America. Rex v. Askew, 4 Burr. 2186, 16 Eng. Rul. Cas. 760, Ann. See also the cases cited in a note to Reg. v. Lord Commissioners, 16 Eng. Rul. Cas. 785. It is described by Lord Mansfield in Rex v. Barker, 3 Burr. 1265 (1762) and a little later Blackstone wrote: "A writ of mandamus is, in general, a command issuing ·in the King's name from the court of King's Bench, and directed to any person, corporation, or inferior court of judicature within the King's dominions, requiring them to do some particular thing therein specified which appertained to their office and duty, and which the court of King's Bench has previously determined or at least supposed to be consonant to right and justice." Blackstone, Comm. Bk. 3, p. 110. By this time the arbitrary features of the writ had disappeared. It no longer created a duty, but was based upon law existing dehors the writ. The prerogative form was still preserved, and under English law, even since the enactment of the common law procedure act of 1854 and the judicature act of 1873, a distinction has been made between the prerogative writ and the action of mandamus which is authorized by the statute. Reg. v. Lambourn, 22 Q. B. Div. 463; Glossop v. Heston L. R. (1879) 12 Ch. Div. 102. In this country the form of a prerogative writ is· still preserved, although because of our form of government this has ceased to have any particular importance.

When our constitution was adopted, the writ of mandamus was granted only in certain well-defined cases. It issued only to command and compel the performance of clearly defined duties which were already prescribed by law. 8 Enc. of Laws of England, 96, and cases there cited. The present "existence of a legal right or obligation is the foundation of every writ of mandamus." Lord

Campbell, Ex parte Napier (1852) 18 Q. B. 692, 695. No new duty was created by the writ; it was neither a law nor the source of law; it never commanded the performance of an act which was unauthorized in the absence of the writ. Its office was to compel the performance of a plain and positive existing duty, and it issued only upon the application of one who had a clear right to demand the performance of such duty. It issued only to compel a party to do that which it was his duty to do without the command of the writ, and the obligation had to be both peremptory and clearly defined. By it judicial powers were set in motion and the performance of administrative duties compelled. Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60; Kendall v. U. S., 12 Pet. 524, 9 L. Ed. 1181, 10 L. Ed. 317; Com. v. Boutwell, 13 Wall. 526, 20 L. Ed. 631; Ex parte Cutting, 94 U. S. 14, 20, 24 L. Ed. 49; U. S. v. Blaine, 139 U. S. 306, 319, 11 Sup. Ct. 607, 35 L. Ed. 183; International v. Lamont, 155 U. S. 303, 308; Roberts v. U. S., 176 U. S. 221, 229, 20 Sup. Ct. 376, 44 L. Ed. 443; La Grange v. State Treasurer, 24 Mich. 468; People v. Campbell, 72 N. Y. 496; People v. Board, 107 N. Y. 235, 13 N. E. 920; People v. Newton, 112 N. Y. 396, 19 N. E. 831, 3 L. R. A. 174; Ex parte Railway Co., 121 N. Y. 536, 24 N. E. 951, 9 L. R. A 124; People v. City, 193 Ill. 507, 62 N. E. 179, 58 L. R. A. 853, and note; State v. Whitesides (S. C.) 9 S. E. 661, 3 L. R. A. 777, and cases cited in note thereto.

Thus a railway company sought the writ of mandamus to compel a board of public works to issue a permit authorizing it to open a street for the purpose of substituting electric power for horse power, but it was denied because it was not clear that the existing law made it the duty of the commissioners to issue the permit. People v. Newton, supra. Thereafter the legislature passed a statute which expressly imposed this duty upon the commissioners and upon a new application a writ of mandamus issued to compel performance of the duty thus clearly imposed by the statute. Ex parte Railway Co., supra.

It thus appears that the mere fact that a person claims legal rights and that he is entitled to have his rights determined in a legal proceeding does not entitle him to invoke the extraordinary remedy provided by the writ of mandamus. The distinction between cases which are triable in ordinary actions or in special statutory proceedings and

those which may be tried in mandamus proceedings is illustrated by the provisions of the statute under which the petitioner is proceeding. Section 202 provides for cases in which mandamus is the proper remedy. The error, wrong, or neglect of duty which is there referred to relates to duties which are clearly defined by existing law. It is the clear and unquestioned duty of the officer to do or not to do the act, without reference to any order or writ of any court. Upon an application duly made, the statute requires the court to issue an order, which may be treated, in effect, as an alternative writ of mandamus, requiring the official to omit to do what the law forbids, or to do what the law already commands. It is immaterial what name the legislature gives to the proceeding. It provides for a remedial case, within the meaning of the words as used in the constitution, and original jurisdiction therein may properly be conferred upon the supreme court.

But section 203 in express words provides for the institution of and procedure for the trial of an election contest. Mandamus is not, and never was, the appropriate procedure for the trial of an election contest. This petitioner seeks the order of the court to compel certain persons and officials to do what they have no legal right to do without the order of the court. Mandamus will issue to compel a certificate of election to issue upon the returns, in accordance with a decision made by the proper body; but when it becomes necessary to go beyond the returns, and consider questions touching the legality of elections, or of fraud, illegal voting, or the like, mandamus is not the proper action, and it is necessary to resort to quo warranto, or such statutory proceedings as may be provided on such occasions. McCrary, Elec. (4th Ed.) § 398, citing State v. Churchill, 15 Minn. 369 (455). The statute now under consideration has provided a full and adequate remedy for the trial of such contests. Section 202 provides for an application to either the district or supreme court, and there is no doubt that the legislature has full power to confer original jurisdiction for the purposes therein referred to upon either court. It is equally clear that the legislature may authorize and direct the district courts to hear and determine election contests referred to in section 203 by means of the procedure provided for in section 202, but the supreme court can be authorized and directed to entertain original

jurisdiction only in the remedial cases referred to in the constitution. These words, according to the established rule, refer only to the extraordinary writs, such as mandamus, quo warranto, and the like.

The proceeding authorized by sections 202 and 203 is either an ordinary action, or a proceeding in the nature of mandamus. If the former, original jurisdiction to entertain it cannot, under the constitution, be conferred upon the supreme court. If the latter, it is not a case properly determinable by a writ of mandamus, as that writ was understood when the constitution was adopted, and has since been universally and consistently used. If the legislature may confer upon the supreme court original jurisdiction in ordinary actions by merely authorizing them to be tried in an action of mandamus, it may, by the mere expansion of the definition, confer original jurisdiction to try at least any civil action which may be tried without a jury. This cannot have been the purpose of the framers of the constitution or of the people by whom it was adopted. We therefore hold that section 203, in so far as it attempts to confer upon the supreme court original jurisdiction to hear and determine election contests, is invalid and unconstitutional. The application must be made, in the first instance, to the district court, and, after the issues have been there heard and determined, the proceedings will be subject to review on appeal.

Proceedings dismissed.