STATE ex rel. HUGO SCHWARTZKOPF and Another v. CITY
COUNCIL OF BRAINERD.[1]

April 18, 1913.

Nos. 18,025—(22).

**Mandamus — demurrer — removal of city officers.**

Section 12 of the city charter of Brainerd imposes no duty upon the
city council to entertain and hear a petition filed by citizens and taxpayers,
whether specially interested or not, preferring charges against city officers
and demanding their removal; and hence an alternative writ of mandamus
to compel the council to fix a time and place for a hearing upon charges so
preferred was demurrable.

Upon the relation of Hugo Schwartzkopf and R. M. Sheets the dis-
trict court for Crow Wing county granted its alternative writ of man-
damus, directing the members of the city council of Brainerd to fix
a time and place for hearing charges preferred against the president
of the water and light board, and requiring the council to secure
other counsel to advise them in the premises, or to show cause why
they had not done so. Respondents demurred to the writ on the
ground that it appeared on its face that it did not constitute a cause
of action, nor show any cause why the writ should be obeyed, and
also moved to quash the writ. The matter was heard by Stanton,
J., who denied the motion to quash the writ and to dismiss the order
to show cause, and gave respondents leave to answer. From his
order denying their motion to quash the alternative writ and overrul-
ing their demurrer, they appealed. Reversed.

*M. E. Ryan,* for appellants.
*Russell & Barron,* for respondents.

[1] Reported in 141 N. W. 97.

Note.—On the question who is the real party in interest by whom mandamus
proceedings must be instituted, see note in 64 L.R.A. 622.

PHILIP E. BROWN, J.

Prior to any of the occurrences disclosed in this proceeding, Brainerd framed and adopted a charter for its government as a city, and still continues to be so governed. Among other things this charter provides:

"Sec. 12. Every person appointed to any office by the city council or mayor, or elected to any office by the people, may be removed from such office by a vote of two-thirds of all the aldermen authorized to be elected. But any officer elected by the people or appointed by the mayor shall not be removed except for cause, nor unless first furnished with a copy of the charges, nor until such person shall have reasonable opportunity to be heard in person, or by counsel in his own defense. The city council shall fix the time and place for the trial of such officer, of which not less than ten days notice shall be given to such officer and to the aldermen, and shall have the power to compel the attendance of witnesses and the production of papers, and to hear and determine the case; and if such officer shall refuse or neglect to appear and answer such charges, the city council may declare such office vacant. Among such causes shall be continued absence by aldermen without leave, from three successive regular meetings of the city council, or a member of a board from the meetings of such board, or neglect of duty of any officer."

"Sec. 46. The city council shall examine, audit, and adjust the accounts of all the city officers and agents of the city at such times as they may deem proper, and also at the end of each fiscal year and before the term for which the officers of said city were elected or appointed shall expire; and the city council shall require and may compel by proceedings in court each and every such officer and agent to exhibit his books, accounts and vouchers for such examination and settlement, and if any such officer or agent shall refuse to comply with the orders of said council in the discharge of his said duties in the pursuance of this section, or shall neglect or refuse to render his accounts or present his books or vouchers to the city council or a committee thereof, it shall be the duty of the city council to declare the office of such person vacant; and the city council shall order suits and proceedings at law against any officer or

agent of said city who may be found delinquent or defaulting in his accounts or in the discharge of his official duties, and shall make a full record of such settlements and adjustments."

On December 5, 1911, one of these relators, with others, filed with the city council a petition praying the council to investigate and audit the water and light board, under section 46 of the charter above set out. Thereafter a committee was appointed by the council to conduct the investigation, which committee filed a report. The council, however, determined to prefer no charges against any city official involved in the proceeding.

On September 3, 1912, these relators filed with the council a verified petition, alleging, among other things, that they were resident citizens of the city and were consumers of its water and light; that they petitioned for and in behalf of themselves and all other citizens of the city and consumers of its water and light; that during the investigation and audit of the water and light board referred to sworn testimony was taken before the council, and that the evidence adduced during such investigation was amply sufficient to require the council to remove the president of the water and light board; that all allegations set out in the petition as founded on information and belief were based upon such sworn testimony so taken. The petition charged the president of the water and light board with being the president of a banking corporation organized under the laws of the state and doing a banking business in the city, and that such bank had established, as the petitioners were informed and believed, "banking relations with certain members of the city council and members of said board, and [had] loaned money to certain members of the city council and of said board, and has otherwise entered into financial transactions with the intent to influence the said members of the city council and members of said board to vote favorably on propositions involving" the bank and the president of the water and light board.

The petition further charged, on information and belief, that between December 25, 1909, and January 1, 1910, the said president paid to one of the aldermen of the city five dollars, "with intent to bribe, influence, and corrupt" such alderman, and to procure

his favorable vote on matters in which the president of said board was interested; and a like transaction between the president and another alderman was similarly charged as of date June 1, 1911. Allegations were also made that the president, in May, 1911, made a trip to St. Paul, with another member of the board, expending $57.41 of the board's money without authority, and that he entertained such other member of the board on such trip "with intent to influence and corrupt" him and to procure his vote on matters in which the president was interested, and further that he made presents to members of the board as and for his bank, at the expense of the board, was guilty of extravagance and neglect of duty in the renting of rooms for the board's use, and in allowing the city attorney to write insurance on the property of the board, and was guilty of malfeasance in taking the opinion of such attorney concerning the validity of a city contract, knowing that such attorney was counsel for the other party to the contract.

Other charges of malfeasance, nonfeasance, and incompetency were made, the whole petition covering more than six pages of the paper book, and closing with a prayer demanding that the council should, pursuant to section 12 of the charter, proceed forthwith to remove the said president, and should declare his office vacant.

On September 16, 1912, the city council adopted a resolution "that there is no cause for the granting of said petition, or for proceeding thereunder, and that said petition be and the same is hereby denied." Whereupon the relators presented their petition to the district court for an alternative writ of mandamus, setting out, in substance, the facts above recited, and making the petition of September 3 and resolution of September 16 a part thereof, and praying, on behalf of themselves and of all other taxpayers and residents of the city and of consumers of its water and light, that a writ of mandamus should issue commanding the city council to fix a time and place for the hearing of such charges, and to comply with section 12 of the charter in all respects. Thereafter, and on September 26, 1912, an alternative writ was issued, reciting the matters stated, commanding the city council, immediately after the receipt of the writ, to fix a time and place for the hearing of the

charges preferred in the petition in accordance with section 12 of the charter, or to show cause, etc. On the return day the council appeared and moved to quash the writ on the ground of the insufficiency of the facts alleged in the petition and writ to constitute a cause of action, and likewise demurred on the same ground. The court denied the motion to quash and overruled the demurrer, and from the order so made the council appealed.

1. The demurrer challenged the adequacy of the facts relied upon by the relators to warrant the granting of the relief demanded (State v. Cook, 119 Minn. 407, 138 N. W. 432) and, for the purposes of this appeal, all the allegations of the writ must be taken as true, so that, if under any reasonable construction thereof the relators are entitled to relief, the order appealed from must be affirmed. If, in connection with these propositions, we keep in mind the elementary principles determinative of the right of resort to the remedy of mandamus, and also the precise question underlying the present controversy, no difficulty in reaching the correct conclusion should ensue. Of these, then, in order:

Where the matter involved relates merely to the enforcement of a private right, the relator must be the person interested in having such right enforced; but where the object is the enforcement of a public duty, not due to the government as such, any private citizen may move to enforce it. The rule is thus laid down in State v. Weld, 39 Minn. 426, 40 N. W. 561, and in the note to State v. Gardner, 98 Am. St. 866, it is stated as follows:

"Where the relief is sought merely for the protection of private rights, the relator must show some personal or special interest in the subject-matter, since he is regarded as the real party in interest, and his rights must clearly appear. On the other hand, where the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party, and the relator, at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result; it being sufficient to show that he is a citizen, and, as such, interested in the execution of the laws."

See, also, People v. Harrison, 253 Ill. 625, 97 N. E. 1092, Ann. Cas. 1913A, 539.

Nevertheless, as declared in Lauritsen v. Seward, 99 Minn. 313, 324, 109 N. W. 404, 409, in defining the function of the writ of mandamus at the time of the adoption of our Constitution:

"It issued only to command and compel the performance of clearly defined duties which were already prescribed by law. 8 Enc. of Laws of England, 96, and cases there cited. The present 'existence of a legal right or obligation is the foundation of every writ of mandamus.' Lord Campbell, Ex parte Napier (1852) 18 Q. B. 692, 695. No new duty was created by the writ; it was neither a law nor the source of law; it never commanded the performance of an act which was unauthorized in the absence of the writ. Its office was to compel the performance of a plain and positive existing duty, and it issued only upon the application of one who had a clear right to demand the performance of such duty. It issued only to compel a party to do that which it was his duty to do without the command of the writ, and the obligation had to be both peremptory and clearly defined." The writ still has precisely the same office. "A writ of mandamus," said Chief Justice Start, in State v. Cook, 119 Minn. 407, 411, 138 N. W. 432, 434, "will issue only to compel the performance by an inferior tribunal, corporation, board, or person of an act which the law specifically enjoins as a duty resulting from an office, trust, or station."

We are indebted to Mr. Justice Marshall for the following, from State v. Anderson, 100 Wis. 523, 527, 76 N. W. 482, 483, 42 L.R.A. 239: "Before the petitioner for a writ of mandamus is entitled thereto, he must show more than that there is a public wrong specially injurious to him. He must show that such wrong consists of some failure of official duty clearly imposed by law, and that there is no other adequate specific legal remedy. The duty must be positive, not discretionary, and the right must be so clear as not to admit of any reasonable controversy. These principles are so elementary as not to call for discussion or support by a citation of authorities."

Having stated the relevant principles, let us next define the question to be determined. It is not one of the expediency or wisdom of broadening the powers or duties of the municipal council con-

cerning the disciplining of its officers for misconduct, or whether such body, with that end in view, may of its own motion investigate charges against city officers preferred by citizens; but, as there clearly is no common-law or general statutory obligation, the sole inquiry ultimately involved narrows to this—to state the question most favorably to the relators: Have we here any charter provision which in terms imposes the duty upon the council of doing the identical thing ordered to be done by the writ, or from which such must necessarily result by fair and reasonable construction, interpretation, or implication? If so, then the court's order must be sustained; otherwise, it cannot be.

The relators claim to find such in the provisions of section 12 of the charter above quoted. We cannot so hold; for, even though it be conceded that the relators have a proper status as such so far as concerns their interest in the matter, yet, in our opinion, the charter imposes no positive duty upon the council in the matter of the removal of city officers, except that when, in the exercise of the disciplinary discretion vested in the council by the first portion of section 12, it undertakes to remove an officer appointed by the mayor or elected by the people, it must furnish him with a copy of the charges preferred against him, shall give him an opportunity to be heard, and "shall fix the time and place for the trial"—such latter provisions being mere limitations upon the power of removal previously conferred, and not being intended to impose upon the council any duty either to prefer charges of its own motion or to entertain and hear petitions for removal presented by outsiders, whether citizens and taxpayers or not. The provision that "any officer elected by the people or appointed by the mayor shall not be removed except for cause" is likewise a mere limitation upon the general power of removal previously conferred. It is clear from an analysis of section 12 that every duty prescribed therein is imposed by way of restriction upon the power granted in the first sentence thereof, and all tests lead to this conclusion. Charter provisions of this kind are not unusual, being inserted simply to empower the council, if it be so disposed, to discipline its members, appointees, and city officers. Neither is there anything to warrant us in reading into the charter

a provision authorizing citizens to file charges or to compel investigations. The charter was the handiwork of the people of the city, and it is an extraordinary circumstance, if it was their intention to compel the council to investigate charges such as here involved, that no procedure to that end is even suggested, and no safeguards are provided.

Our conclusion is that section 12 enjoins no duty upon the council to fix a time and place for the hearing of the charges preferred by the relators.

The order appealed from is reversed.