## STATE EX REL. VERA EVELYN ASHCROFT AND ANOTHER v. WALTER N. JENSEN AND ANOTHER.[1]

January 2, 1943.

No. 33,320.

*Durham & Swanson*, for appellants (relators below).
*Mulder, Fassett & Abdo*, for respondents.

PER CURIAM.

This is an appeal from an order of the district court in a *habeas corpus* proceeding giving custody of the minor child of relators to respondents without prejudice to a later renewal of the writ.

We find the following facts. In 1935 Mr. and Mrs. Ashcroft, then unmarried, went to Rochester, where both obtained employment. During this period they associated with each other until Mr. Ashcroft left for Idaho in September 1936. He subsequently moved to Portland, Oregon, in June 1937, where he has since remained. The child, Judith Ann, was born to relator Vera on

[1]Reported in 7 N. W. (2d) 393.

December 2, 1936. Both Mr. and Mrs. Ashcroft state that Mr. Ashcroft is the father of the child.

In September 1936 Vera came to Minneapolis to prepare for the birth of her child. While there her employer provided her with needed funds for expenses, took her to the hospital for the birth of the child, and later returned her to her temporary home in Minneapolis. She remained in Minneapolis until April 24, 1937. On that date the child was placed in respondents' care, and arrangements were made by her employer for compensating them. Respondents understood that the child was not available for adoption. The child has been with respondents since that time.

The testimony of Vera and that of her employer are diametrically opposed concerning the placing of the child. The employer testified that the child was taken to the respondents with the full knowledge and consent of Vera; that she prepared the infant's diet, wrote out the necessary formulae, laid out the child's clothes, and sent them along with the employer. Vera testified that her employer came to her place of residence and, with threats of violence and at the point of a gun, forcibly took the child from her; that he then and thereafter refused to inform her as to the child's whereabouts. Despite this very unusual conduct on the part of the employer, there is no dispute that Vera returned to Rochester, reëntered her former employment with the same employer, and succeeded in taking an important part in the management of his business. This relationship continued until April 1940. On this date Vera left for Oregon and joined her present husband. Their marriage took place on May 4, 1940.

Until 1939 payments were made to respondents for the care of the child. These contributions were made partly by Vera and partly by her employer. Since 1939 no payments have been made. Despite this, respondents have continued to care for the child, have become closely attached to it, and have taken steps toward its adoption.

Vera contends that she has constantly sought information as to her child's whereabouts but that her employer has thwarted her

in these efforts. Since their marriage, her husband has joined her in this attempt. Investigations made by a welfare organization in Portland, Oregon, indicate nothing to suggest that the Ashcrofts are morally unfit to have the custody of their child. Mr. Ashcroft is now employed as a clerk in the United States Army Engineer's office and earns $144 a month. Vera is employed as a waitress and earns about $130 a month. Their aim is to have Mr. Ashcroft's parents move to Oregon to care for the child in the event they obtain custody of it.

Respondents have a home in Minneapolis and reside there with their two daughters, ages 19 and 16. Mr. Jensen is employed as a furrier and earns $200 a month. No one disputes that the child has had excellent care and has developed into a bright, active, and healthy little girl.

The principles governing in these cases have many times been stated by this court. See State ex rel. Olson v. Sorenson, 208 Minn. 226, 293 N. W. 241, and cases there cited. Ordinarily, parents are entitled to the custody of their child. Every court recognizes the deep and enduring affection which parents have for their children and their willingness to make sacrifices and endure hardships in their interests which a stranger would not consider. No court would deprive a parent of his child simply because someone else might give it better care or attention than the means of the parent permit. The sanctity of the home and the maintenance of family life form the foundation of our society and are of paramount importance now as in the past.

Exceptional cases often arise, however, where this desired relationship between parent and child does not exist. It has not existed here. Since the time when this child was but a few months old it has been exclusively in respondents' care. The Jensens are the only parents it knows, and their home has been its home. It would be as tragic to remove this child from the Jensens' home as to take a child from its natural parents with whom it is living. We conceive that serious emotional and psychological maladjustment would result if the child were transferred from the Jensen

to the Ashcroft home. This we should avoid unless overpowering reasons require it. The first and chief concern is the welfare of the child. Gauthier v. Walter, 110 Minn. 103, 124 N. W. 634; State ex rel. Larson v. Halverson, 127 Minn. 387, 149 N. W. 664; State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N. W. 414; State ex rel. Henning v. Gundvaldson, 169 Minn. 335, 211 N. W. 310.

There are sufficient improbabilities in the story of Vera Ashcroft to raise the question of its credibility. We feel it inadvisable to act upon her testimony. Moreover, her husband, the father of her child, has shown no great interest, insofar as the record reveals, in the child or in its care or custody. He was informed by Mrs. Ashcroft of the child's birth six months after it was born and that he was its father. Yet during all of the ensuing period the record reflects no attempt by him to visit the child nor to contribute to its support. Neither are we satisfied that we know the kind of home the child would have should it go to Oregon with the Ashcrofts. We know that the home it has now is a satisfactory one.

In view of these considerations, we believe the lower court reached a wise and satisfactory solution. The child should remain with respondents until such future time as relators can present a more convincing case for her custody, and it is so ordered.

Affirmed.

Pirsig, Justice (concurring specially).

When the case was submitted to this court on oral argument considerable uncertainty existed on the part of counsel as to the basis upon which this court should proceed. It was finally agreed that this court should consider the questions involved as original questions but confined to the record of the lower court. This has led me to examine the status of cases of this kind when presented to this court on appeal from a decision of the lower court.

An examination of past cases discloses that this court has proceeded in two ways. First, the consideration of the case has been confined to the evidence adduced in the court below. This was done in the instant case. Second, the case has been heard on its own, or on additional, evidence taken in this court. Invariably

this is done by appointing a referee to take the testimony and report it to this court. The policy has been to designate as referee the judge before whom the case was heard in the court below. In both cases we have treated the case as though it were in this court on a trial *de novo*.

Little consideration has been given to the propriety or necessity of this procedure. Prior to 1895 this practice did not exist. It is the result of an act passed in that year (L. 1895, c. 327, § 3), which provided in part:

"The said appeal shall be tried in the supreme court in the same manner as if the original writ of habeas corpus had been granted and issued out of that court, and upon such hearing said court shall make and give final judgment therein. And if the person in whose behalf the writ was applied for is a minor child of tender years the court shall as a part of its judgment determine the person or party who is entitled to control and direct the education and training of such child."

This now appears as part of Minn. St. 1941, § 589.30 (Mason St. 1927, § 9768). The constitutionality of the act seems never to have been raised; no doubt for the reason that the statute was considered merely as one permitting the exercise of this court's original jurisdiction in *habeas corpus* cases. I am convinced that the statute was not intended to include cases of this kind, or, if it was, that it is not constitutionally valid. Since the question goes to the jurisdiction of this court, we are under a duty to raise it on our own motion. Seiz v. Citizens Pure Ice Co. 207 Minn. 277, 290 N. W. 802; Bulau v. Bulau, 208 Minn. 529, 294 N. W. 845; County Board of Education v. Borgen, 192 Minn. 512, 257 N. W. 92.

Minn. Const. art. 6, § 2, provides that this court shall have original jurisdiction "in such remedial cases as may be prescribed by law." The term "remedial cases" refers to the prerogative or extraordinary writs of the common law, such as *quo warranto, mandamus,* prohibition, and includes also *habeas corpus.* See

State ex rel. Clapp v. Minnesota T. M. Co. 40 Minn. 213, 41 N. W. 1020, 3 L. R. A. 510. It was not intended by this provision to give this court any substantial original jurisdiction, but rather to provide remedies in unusual cases where an adequate remedy was not available in the trial courts of the state. The purpose to be served in these cases has been ably stated in Lauritsen v. Seward, 99 Minn. 313, 321, 109 N. W. 404, 407:

"The supreme court of the state is a constitutional appellate court, with original jurisdiction only in the particular instances in which it is expressly conferred by the constitution. Its appellate jurisdiction is general and unrestricted; its original jurisdiction is special, and restricted. The general policy which was embodied by the people in that instrument is apparent upon the slightest consideration. The judicial system created by the constitution rests upon the theory that general original jurisdiction is vested in the district courts, which have succeeded historically to the ancient English court of King's Bench. In these and inferior courts of original jurisdiction all cases are supposed to be heard and determined in the first instance. Over and above these courts is placed an appellate court, charged with the power of supervision, review, and cassation. The organization and constitution of that court is adapted primarily to the work of review only.

"But under every system contingencies will arise which call for the peremptory and prompt relief which only a court of final resort can grant. Under the English system, these instances were provided for by the King's prerogative, by means of which relief was granted in cases where the ordinary courts were powerless, and no other adequate remedy was provided. In the course of time this great prerogative power came to be exercised by means of certain remedial writs, issuing in the King's name out of the court in which the King theoretically or in fact was always present. Recognizing the occasional necessity for such extraordinary proceedings, the framers of the constitution provided that the supreme court 'shall have original jurisdiction in such remedial cases as may be prescribed by law, and appellate jurisdiction in all cases

both in law and equity, but there shall be no trial by jury in said court.' Const. art. 6, § 2. The legislature is thus authorized to confer original jurisdiction upon the supreme court in remedial cases, subject to the limitation that there shall be no trial by jury. It can confer original jurisdiction in no other cases."

In including *habeas corpus* as one of the remedies over which this court has original jurisdiction, it must be borne in mind that this writ was used in two different classes of cases at common law and prior to the adoption of our constitution. The writ of *habeas corpus ad subjiciendum et recipiendum* covered one class. It was available to one who claimed that he was confined and deprived of his liberty by arbitrary official action primarily in connection with a criminal charge. The famous act of 31, 12 Charles II, c. 2, enacted in 1679, preserved this writ for that purpose, and it became one of the great constitutional safeguards of our liberty. III Blackstone, Commentaries, 135; 9 Holdsworth, History of English Law, 118. The writ of *habeas corpus* normally is thought of in connection with this function, and it is in this sense that the term is usually used in constitutional provisions. Thus our constitution, art. 1, § 7, which deals with the rights of an accused, provides: "the privilege of the writ of habeas corpus shall not be suspended unless when in case of rebellion or invasion the public safety may require."

But this is not the only class of cases in which the writ of *habeas corpus* was available. It was also used as a procedural device to bring parties and causes before the court in a wide variety of other cases, including ordinary civil litigation, both in the common law and equity courts. It was used in equity, among other instances, to compel an appearance or to compel an answer to be made. The common-law courts used it "for removing prisoners from one court into another for the more easy administration of justice." III Blackstone, Commentaries, 129. Common use was made of it for the purpose of determining the right to the custody of a child, and this particular use of the writ has continued to the present day. See In re Burrus, 136 U. S. 586, 10 S. Ct. 850, 34

L. ed. 500; New York Foundling Hospital v. Gatti, 203 U. S. 429, 27 S. Ct. 53, 51 L. ed. 254. The writ when used for these purposes was distinguished from the writ of *habeas corpus ad subjiciendum* and was referred to by different names. See III Blackstone, Commentaries, 129, *et seq.;* 1 Holdsworth, History of English Law, 227. The distinction has continued to the present time. Thus Chancellor Walworth in People ex rel. Barry v. Mercein, 8 Paige Ch. (N. Y.) 47, 55, said: "A writ of *habeas corpus ad subjiciendum* \* \* \* is not \* \* \* by the common law \* \* \* the proper mode of instituting a proceeding to try the legal right of a party to the guardianship of an infant." The distinction has been observed in this state. Thus Mr. Justice Mitchell said in State ex rel. Lembke v. Bechdel, 37 Minn. 360, 34 N. W. 334, 335, 5 A. S. R. 854, after referring to the writ as a "writ of liberty":

"But such cases are clearly distinguishable, we think, both upon principle and authority, from those in which the writ is sued out merely for the purpose of determining which of two parties is entitled to the custody of an infant child. In the latter, the question is not really whether the infant is restrained of its liberty, but, who is entitled to its custody? It is true that the charge is that the child is unlawfully restrained, etc.; but the gist of this charge is not that the child is unlawfully deprived of its liberty, but that such restraint is in prejudice of the right of the relators to its custody. The case is really one of private parties contesting private rights, under the form of proceedings on *habeas corpus.*" See also State ex rel. Evangelical L. K. Society v. White, 123 Minn. 508, 144 N. W. 157.

It is important that these differences in the forms of the writ be recognized. Policies, rules of law, and constitutional principles applicable to one should not be applied to the others without discrimination. When we consider the history of the various forms of the writ and the purpose of our constitution in conferring original jurisdiction upon this court in remedial cases, it becomes evident that the framers of the constitution intended to confine the

use of the writ in this court as an original proceeding to instances where the relator seeks release from an unlawful detention or confinement. It does not include cases where the right to the custody of a minor is involved. In the latter cases extraordinary action by this court is not required. Only the civil right to the care and control of the child is involved. I do not believe that the framers of the constitution intended that this court should exercise a function so foreign to the primary purpose for which it was created.

Practical considerations also point to the conclusion that these views accord with the intention of the framers of the constitution. In determining the custody of a child, many intangible factors not revealed by the cold printed or written word are of prime importance. Such elements as the character and personality of the individuals involved and their demeanor on the witness stand when under the searching inquiry of cross-examination are of great importance in determining the questions of vital human relationships presented by these cases. This court does not have the means nor the facilities to conduct the needed inquiry by examination of witnesses. When additional testimony has been needed in proceedings under the statute now being considered, we have appointed referees to take the testimony and report it to this court. But, since no findings are submitted by the referee, we do not have the benefit of his views and impressions, although he personally heard and saw the witnesses. An examination of the cases heretofore decided under the statute here considered shows that in fact we have had to rely substantially upon the views of the court below in reaching our decisions. In some two-thirds of the cases we have done no more than confirm the decision of the court below.

Whenever possible, statutes should be so construed that they will be constitutionally valid. Badger Dome Oil Co. v. Hallam (8 Cir.) 99 F. (2d) 293; Chippewa Indians of Minnesota v. United States, 301 U. S. 358, 57 S. Ct. 826, 81 L. ed. 1156; Porter v. Investors Syndicate, 286 U. S. 461, 52 S. Ct. 617, 76 L. ed. 1226. We should accordingly construe the portion of L. 1895, c. 327, § 3, above quoted, as being confined to the cases where the remedy of

*habeas corpus* can be properly conferred upon this court and as not extending to cases such as this, involving the right to the custody of a child. In the latter type of cases, when appeals are taken to this court they should be dealt with as any other appeal. Questions of fact should be determined below and findings should be made upon the evidence adduced. On appeal these findings and the order made thereon should be governed by the usual rule that if they are sustained by substantial evidence this court will not reverse. In the present case the trial court has fully and ably presented a statement of the facts found and the conclusions reached. They are fully sustained by the evidence, and hence for this and the reasons set forth in the main opinion I concur.